No. 47,467

The City of Garden City, Kansas, *Appellee,* v. Brigido Guillen Mesa, *Appellant.*

(527 P. 2d 1036)

Opinion filed November 2, 1974.

*J. Stephen Nyswonger,* of Braun & Nyswonger, of Garden City, argued the cause, and *Lelyn J. Braun,* of the same firm, was with him on the brief for the appellant.

*William B. Bolin,* of Garden City, argued the cause, and was on the brief for the appellee.

The opinion of the court was delivered by

Schroeder, J.: This case presents a serious question concerning the application of K. S. A. 1973 Supp. 22-2402 (1) commonly referred to as our "stop and frisk" statute, and the role of the Fourth Amendment of the Federal Constitution in the confrontation between a citizen in a public place and the policeman investigating suspicious circumstances.

Brigido Mesa (defendant-appellant) has appealed from a conviction of resisting or opposing a police officer in the discharge of his duties in violation of Garden City, Kansas, Ordinance Section 20-15. Mesa was originally found guilty in Garden City Municipal Court and sentenced to pay a $25 fine and costs. On appeal to the district court the matter was determined upon stipulation solely from the transcript taken in the municipal court proceedings and briefs filed by the parties. The district court found Mesa guilty as charged but suspended sentence due to the surrounding circumstances. Mesa has duly perfected an appeal.

On May 26, 1973, Officers James W. Phillips and Patrick Connon of the Garden City Police Department were dressed in police uniforms and working together on the night shift patrol. At 4:00 o'clock a. m. the officers were cruising down South Main Street in their marked patrol car when they observed Mesa standing in the

doorway of th Motor Electric Shop at 216 South Main. There were lights on in the shop, but its door was closed.

After seeing Mesa the officers circled the block and parked their patrol car in front of the shop. Both officers got out of their vehicle, walked up to Mesa, greeted him with a "Good morning" and requested some identification. Mesa responded that it was none of the officers' business who he was or what he was doing. The officers made their request a second time and Mesa answered that he was doing some work in the electric shop. The officers again asked Mesa for some identification, and Mesa turned away from them and walked inside the shop. Officer Phillips caught up with Mesa, stepped in front of him to block his path, and told him "that was as far as he was going to go, we were going down to the [police] station." At that point Mesa put his hands on Officer Phillips and attempted to push him to one side and go around him. Officer Connon grabbed one of Mesa's arms, turned him around, and handcuffed him. The officers then took Mesa to their patrol car and called for their sergeant to join them and transport Mesa to the police station.

In a short while Sergeant Broetzmann arrived at the scene. The sergeant had met Mesa on a previous occasion and knew his name. He attempted to calm Mesa. Before departing for the police station, Mesa asked that the business be locked and he provided the keys to the officers.

At the trial in municipal court, Officer Phillips testified during cross-examination that there was nothing he observed in Mesa's conduct when they first saw him standing in the shop doorway which indicated he was involved in the commission of any crime, and Mesa's behavior did not indicate anything suspicious about what he was doing there. Phillips also stated that Mesa was not under arrest until after pushing Phillips out of his way. On redirect examination Officer Phillips stated that one of an officer's duties, in relation to the security of buildings at night, was to check out any unfamiliar persons, and that when he observes someone standing around a business at 4:00 o'clock a. m. he becomes suspicious and finds out who the person is and what he is doing. Phillips had patrolled on previous occasions in the vicinity of the electric shop on the night shift, and, though he had seen lights on in the shop, he had never seen anyone working there.

Officer Connon's testimony was substantially similar to that of Phillips. Connon stated on redirect examination the purpose of

investigating individuals standing around buildings in the middle of the night was for the protection and security of the buildings in reference to burglars.

On cross-examination Connon had previously testified:

"Q. When you went up to that building that night that building was well lighted, wasn't it?

"A. Yes, sir.

"Q. There was nothing that Mr. Mesa was doing when you went by that indicated any violation of any laws against this city, state or the United States Government, was there?

"A. No, sir.

"Q. He didn't attempt to flee or he didn't attempt to do anything that indicated that he was about ready to or had just recently participated in any type of crime?

"A. No, sir.

"Q. Now how did he look as a matter of fact? What did his clothes look like when you first walked up there to see him?

"A. Clean and neat, not overly dressed in any manner."

The district court, after examining the municipal court transcript and the briefs submitted by the parties, found:

". . . [T]hat under the circumstances existing the officers were justified in approaching and requesting Mr. Mesa's identity and in fact would have been derelict in their duty if they had not done so. That thereafter when Mr. Mesa pushed away from the officers that he was resisting and opposing an officer in violation of Ordinance Section 20-15 and is guilty as charged. While this result is predicated on the Court's finding that under the circumstances the officers were acting reasonably and with justification, such finding is unnecessary to the decision of the case. In any event, it was the duty of Mr. Mesa as a citizen to cooperate rather than resist the officers. However, since it has now been determined Mr. Mesa was not engaged in committing any crime upon the premises and since such resistance as he gave the officers was technical in nature, the Court does not believe that Mr. Mesa deserves to be punished, especially since before the incident was over it has been established that Mr. Mesa had the key to the premises and had a legal right to be upon the premises."

The district court thereupon suspended sentence and assessed the costs to the city.

The city ordinance under which the appellant was arrested is contained in the Code of Ordinances of the City of Garden City, Kansas, Section 20-15, titled, "Resisting an Officer". It reads:

"It shall be unlawful for any person in the City to resist or oppose any police officer of the City in the discharge of his duties or knowingly and willfully assault, beat or wound any police officer while in the discharge of an official duty."

The parties to this action concede that whether each of the police officers on the facts heretofore related was acting "in the discharge of his duties" is controlled by K. S. A. 1973 Supp. 22-2402 (1). It pertains to the stopping of a suspect and provides:

"Without making an arrest, a law enforcement officer may stop any person in a public place whom he reasonably suspects is committing, has committed or is about to commit a crime and may demand of him his name, address and an explanation of his actions."

The foregoing statute was first before this court in *State v. Jackson*, 213 Kan. 219, 515 P. 2d 1108, where the court said:

"The state recognizes, and correctly so, that even though 'stop and frisk' has now been codified in 22-2402, police conduct in a 'stop and frisk' situation must be judged under the reasonable searches and seizures clause of the Fourth Amendment to the Constitution of the United States and the judicial interpretations thereof. This point was made by the United States Supreme Court in *Sibron v. New York*, 392 U. S. 40, 20 L. Ed. 2d 917, 88 S. Ct. 1889, in considering the reasonableness of searches and seizures under The Consolidated Laws of New York Annotated, Code of Criminal Procedure, § 180-a (now § 140-50, effective September 1, 1971). The New York statute was followed in the drafting of 22-2402. (See Judicial Council Comment appended to K. S. A. 1972 Supp. 22-2402.)" (p. 222.)

While the United States Supreme Court in *Sibron v. New York*, 392 U. S. 40, 20 L. Ed. 2d 917, 88 S. Ct. 1889, declined to approve expressly the language of the New York statute, it found on the facts there presented that the conduct of an officer acting within the statute was not offensive to the Fourth and Fourteenth Amendments.

It is readily apparent 22-2402 was designed by the legislature to clarify the power of the investigating officer prior to the actual arrest. The justification and limitations applicable to such powers are expressed by the Supreme Court of the United States in *Terry v. Ohio*, 392 U. S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 and *Sibron v. New York*, supra. This is indicated by the Judicial Council Comment appended to K. S. A. 1973 Supp. 22-2402.

In resolving the issue before the court we must therefore look to *Terry v. Ohio*, supra, upon which both of the parties to this appeal rely.

While the facts in *Terry* and in *State v. Jackson*, supra, involve both a search and a seizure, as distinguished from a seizure of the person prior to arrest in the instant case, the basic underlying principles are the same.

*Terry* reaffirms that the Fourth Amendment right against unreasonable searches and seizures, made applicable to the states by the Fourteenth Amendment, (*Mapp v. Ohio*, 367 U. S. 643, 6 L. Ed. 2d 1081, 81 S. Ct. 1684, 184 A. L. R. 2d 933), "protects people, not places," and therefore applies as much to the citizen on the streets as well as at home or elsewhere. No right is held more sacred, or is more carefully guarded, by the common law than the right of every individual to the possession and control of his own person, free from all restraint or interference, unless by clear and unquestionable authority of law. Wherever an individual may harbor a reasonable expectation of privacy, he is, as a matter of constitutional law, entitled to be free from unreasonable governmental intrusion; the specific content and incidents of this right must be shaped by the context in which it is asserted. (*Terry v. Ohio*, supra.)

The Fourth Amendment applies to "stop and frisk" procedures. In *Terry* it was said whenever a police officer accosts an individual and restrains his freedom to walk away, he has "seized" that person.

It was asserted in *Terry* that in determining whether the Fourth Amendment was violated by a police officer's seizure of a person by way of stopping him for interrogation, the notions which underlie both the warrant procedure and a requirement of probable cause remain fully relevant; in order to assess the reasonableness of a police officer's conduct as a general proposition, it is necessary first to focus upon the governmental interests which allegedly justified official intrusion upon the constitutionally protected interest of a private citizen, and in justifying the particular intrusion the police officer must be able to point to specific articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.

The court in *Terry* goes on to state:

". . . The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances. And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate? Cf. *Carroll v. United States*, 267 U. S. 132 (1925); *Beck v. Ohio*, 379 U. S. 89, 96-97 (1964). Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result this Court has consistently refused to sanction. See, *e. g., Beck*

*v. Ohio,* supra; *Rios v. United States,* 364 U. S. 253 (1960); *Henry v. United States,* 361 U. S. 98 (1959). And simple ' "good faith on the part of the arresting officer is not enough." . . . If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be "secure in their persons, houses, papers, and effects," only in the discretion of the police.' *Beck v. Ohio,* supra, at 97." (392 U. S., pp. 21, 22.)

In *Adams v. Williams,* 407 U. S. 143, 32 L. Ed. 2d 612, 92 S. Ct. 1921, a police officer working in a high crime area received a tip from an informant, known personally by the officer to be reliable, that the petitioner was carrying some narcotics and a weapon. The officer approached the car petitioner was sitting in and asked him to open the door, but the petitioner instead rolled down the window. The officer then reached through the window and grabbed for the pistol exactly where the informant had said it would be. In the opinion the court said:

"In *Terry* this Court recognized that 'a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest.' *Id.,* at 22. The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response. See *id.,* at 23. A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time. *Id.,* at 21-22; see *Gaines v. Craven,* 448 F. 2d 1236 (CA9 1971); *United States v. Unverzagt,* 424 F. 2d 396 (CA8 1970)." (pp. 145, 146.)

Our difficulty in this case stems from our prior decision in *State v. Jackson,* supra. There the sheriff stopped the defendant who was walking on U. S. Highway 77 a quarter of a mile north of Rock, Kansas, at about 2:50 a. m. The defendant was frisked and car keys were found on his person. After interrogation the officer arrested the defendant on a charge of vagrancy. In the opinion the court said:

"The gist of the *Williams* [*Adams v. Williams,* 407 U.S. 143, 32 L. Ed. 2d 612, 92 S. Ct. 1921] opinion is that the stop of a suspicious person may be reasonable if coupled with some facts known to the officer. Applying *Williams* to the instant case, O'Dell had no prior knowledge, and the stop was made because of custom rather than by reason of any suspicious conduct on the part of defendant observed by O'Dell. Neither does O'Dell's testimony indicate that defendant's responses to interrogation furnished reasonable grounds for belief that defendant was armed or might endanger the safety of O'Dell or of others.

"In the light of what has been said in the foregoing cases mentioned and discussed herein, we believe that *the 'stop' authorized by 22-2402 requires that a law enforcement officer must* have prior knowledge of facts *or observe conduct of a person which causes the officer to reasonably suspect that such person is committing, has committed, or is about to commit a crime.* Further, in order to justify the search for weapons authorized under the provisions of subsection (2) of 22-2402, the officer must have prior knowledge of facts or observe conduct of the person or receive responses to the limited interrogation authorized by subsection (1) which, in the light of his experience, would cause the officer to reasonably suspect that his personal safety requires such search.

"It should be kept in mind, of course, that the reasonable suspicion on the part of an officer required by 22-2402 does not rise to the level of probable cause required by the preceding section K. S. A. 1972 Supp. 22-2401, which deals with the making of an arrest.

"The reasonableness of a search is, in the first instance, a substantial determination to be made by the trial court from the facts and circumstances of the case. (*Ker v. California*, 374 U. S. 23, 10 L. Ed. 2d 726, 83 S. Ct. 1623.) In the light of officer O'Dell's testimony in the instant case it cannot be said the trial court erred in suppressing the evidence in question." (pp. 224, 225.) (Emphasis added.)

The issue in *Jackson* concerned the trial court's suppression of evidence which consisted of the keys taken by the sheriff upon arresting the defendant. The facts in the instant case are not complicated by a search of the defendant's person for weapons.

Based upon some of the testimony in the record presented in the instant case it may be argued, as the appellant does, that the stop was made by the police officers to ascertain the defendant's identity because of custom or departmental policy of the police department. Officer Phillips, however, testified that he was suspicious when he saw a person standing around a business building at 4:00 a. m., thus indicating that his action was not based solely upon departmental policy, but also upon personal observation and evaluation of the circumstances. There is other testimony that it was the police officers' duty, by reason of instructions from their superiors, to ascertain the identity of individuals loitering in a public place near business buildings late at night on the ground that under such circumstances there is a suspicion of possible burglary.

Paraphrasing *State v. Jackson*, supra, the reasonableness of a "seizure" is, in the first instance, a substantial determination to be made by the trial court from the facts and circumstances of the case. In the light of all of the evidence presented by the record in the instant case it cannot be said the trial court erred in finding that under the circumstances the officers were acting reasonably and

with justification in approaching and requesting the defendant's identity and in making the subsequent arrest by reason of the defendant's response and resistance to the officers.

Under K. S. A. 1973 Supp. 22-2402 (1) a police officer is authorized in the discharge of his duties to stop a person loitering in a public place at 4:00 o'clock a. m., where the officer harbors a suspicion of possible burglary, and demand of him his name, address and an explanation of his actions.

The judgment of the lower court is affirmed.

PRAGER, J., dissenting: I am compelled to dissent from the majority's reasoning and decision in this case. The "stop" made by these police officers was clearly motivated by departmental policy rather than by constitutional or statutory grounds. From their testimony it is obvious that neither officer had "reasonable suspicion" to believe a crime was being committed, had been committed, or was about to be committed. Officer Phillips testified on cross-examination that the building was well lighted outside and that lights were on inside. He further testified:

"Q. Was there anything you observed going by the first time or going back that indicated to you this man was involved in a commission of any crime?

"A. No, sir.

"Q. Was there anything about his behavior when you walked up to him that indicated anything suspicious about what he was doing there?

"A. No, sir.

"Q. In other words, in fairness, he appeared to be just like any other citizen standing in a doorway in Garden City, Kansas?

"A. Yes, sir."

Officer Connon also testified on cross-examination with regard to his suspicions, or lack thereof:

"Q. When you went up to that building that night that building was well lighted, wasn't it?

"A. Yes, sir.

"Q. There was nothing that Mr. Mesa was doing when you went by that indicated any violation of any laws against this city, state or the United States Government, was there?

"A. No, sir.

"Q. He didn't attempt to flee or he didn't attempt to do anything that indicated that he was about ready to or had just recently participated in any type of crime?

"A. No, sir."

The majority points out, and seems to rely heavily upon, the testimony of Officer Phillips that he became suspicious when he saw

someone standing around a business establishment at 4:00 a. m. This is pointed out to be an indication that he was operating on the basis of "personal observation and evaluation of the circumstances." I respectfully disagree with this interpretation of Officer Phillips' testimony which was as follows:

"Q. 4:00 o'clock in the morning in front of a business concern, do you become suspicious to see someone standing in front of a business?

. . . . . . . . . . . .

"A. Yes, sir.
"Q. When you see someone standing around a building at 4:00 o'clock in the morning what is your procedure?
"A. To find out who he is and what he's doing there."

These answers were general answers to hypothetical type questions. The officer had previously testified he had no suspicion that criminal activity was afoot in this particular instance.

The Supreme Court of the United States has had several occasions to speak on the subject of investigative stops. See *Terry v. Ohio*, 392 U. S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868; *Sibron v. New York*, 392 U. S. 40, 20 L. Ed. 2d 917, 88 S. Ct. 1889. In its most recent discussion of the issue, the Court said:

"In *Terry* this Court recognized that 'a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest.' *Id.* at 22. The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response. See *id.* at 23. A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." (*Adams v. Williams*, 407 U. S. 143, 145-146, 32 L. Ed. 2d 612, 92 S. Ct. 1921.)

This court, only a year ago, said:

"The gist of the *Williams* opinion is that the stop of a suspicious person may be reasonable *if coupled with some facts known to the officer.*" (*State v. Jackson*, 213 Kan. 219, 224, 515 P. 2d 1108.) (Emphasis supplied.)

In Kansas, standards for such stops have been codified in light of *Terry* and its successors. Commenting on the provisions of K. S. A. 1973 Supp. 22-2402 (1), this court stated in *Jackson:*

". . . the 'stop' authorized by 22-2402 requires that a law enforcement officer must have prior knowledge of facts or observe conduct of a person which causes the officer to reasonably suspect that such person is committing, has committed, or is about to commit a crime." (p. 225.)

Clearly, a stop after some observation of a suspect "casing" a store for a robbery is allowable. (*Terry v. Ohio,* supra.) Also allowable is a stop after receiving a tip from a reliable informant (*Adams v. Williams,* supra; *United States v. Unverzagt,* 424 F. 2d 396 [8th Cir.]; *Gaines v. Craven,* 448 F. 2d 1236 [9th Cir.]); or seeing a man "furtively duck into an alley and hide behind a car in an area plagued with theft." (*State v. Hazelwood,* 209 Kan. 649, 498 P. 2d 607.) However, stopping a car or a person merely because of the appearance of the person's physical make-up (*United States v. Davis,* 459 F. 2d 458 [9th Cir.]; *United States v. Brignoni-Ponce,* 499 F. 2d 1109 [9th Cir.]), or proximity to a suspicious locale (*United States v. Martinez-Tapia,* 499 F. 2d 1244 [9th Cir.]), or a person's known criminal record, (*United States v. Cupps,* 503 F. 2d 277 [6th Cir., Sept. 24, 1974]), cannot in and of itself be justifiable cause to make a "stop" in light of *Terry* and the Fourth Amendment. A stop cannot be made on the basis of "inarticulate hunches." (*Terry v. Ohio,* supra.) Ideally, the officer should bear in mind a combination of factors in making a "stop". Such factors should include:

1. Whether the person fits the description of someone wanted by the police.

2. The general conduct, demeanor, and gait of the person, including attempt at flight when the officer is seen or recognized.

3. The officer's personal knowledge of the person's character and background.

4. What the person is carrying.

5. How the individual is dressed, including any bulges under his clothing.

6. The time of day or night.

7. The geography of the area and the section of the city.

8. Any previous information received.

9. The nearness in place and/or time of the subject to known or reported criminal activity.

10. Any overheard conversation.

11. Whether the person is alone or in a group, or whether an entire group is involved in the suspicious activity. See Meyer, *Arrest Under the New Kansas Criminal Code,* 20 Kan. L. Rev. 685, 735, fn. 248, calling attention to the training manual of the Metropolitan Police Department of the District of Columbia.

I respectfully submit that the observations and facts known to the officers in this case fell far short of the standards set by *Jackson*

and K. S. A. 1973 Supp. 22-2402 (1). Indeed, to allow such conduct on the part of police officers effectively emasculates the safeguards set forth in *Terry* and utterly disregards the statutory minimum requirements of 22-2402 (1).