No. 49,468

CITY OF OVERLAND PARK, KANSAS, *Appellant,* v. JAMES B. SANDY, *Appellee.*

(587 P.2d 883)

Opinion filed December 9, 1978.

*Michael D. Mance,* assistant city attorney, argued the cause and was on the brief for the appellant.

*J. Steven Schweiker,* of the David R. Gilman firm, of Overland Park, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

MCFARLAND, J.: This case comes before us on a petition for review filed by James B. Sandy from the decision of the Court of Appeals. In the Overland Park, Kansas, Municipal Court, Sandy was convicted of possession of stolen property, marijuana, and an unlawful weapon (num-chucks). Sandy appealed the convictions

to the district court. There he made a pretrial motion to suppress the physical evidence, which was sustained. The City of Overland Park then perfected its interlocutory appeal to the Court of Appeals. The Court of Appeals reversed the trial court. *City of Overland Park v. Sandy,* 2 Kan. App. 2d 176, 576 P.2d 1097 (1978).

Sandy and a friend were driving in a lawful manner through the City of Overland Park, Kansas, at approximately 1:00 a.m., on April 15, 1977, when observed by a police officer. At that time, the two cars were traveling in opposite directions. The officer turned his car and followed Sandy, who shortly turned from the roadway into a convenience store parking lot. The officer followed and conducted a routine driver's license check on Sandy. While so doing, he flashed his flashlight into the back seat area and observed a set of scales. The officer had observed similar scales in the near past at police headquarters and knew that like scales had been reported stolen from some of the high schools in the area and some had been recovered. Sandy was then questioned about how he came to be in possession of the scales, and when the officer determined the explanation was not satisfactory, he requested consent to search the automobile. This was voluntarily granted and that search revealed the marijuana and the numchucks. Sandy was then arrested, charged, tried in the municipal court and found guilty of possession of stolen property (scales) and possession of marijuana and a dangerous weapon (numchucks).

The sole question to be decided here is whether K.S.A. 8-244 authorizes police officers to stop an automobile in order to make an isolated spot check for a driver's license. If it does, the discovery and seizure of the scales are justified under the plain view doctrine, and the evidence discovered in the subsequent consent search is not contaminated under the fruit of the poisonous tree doctrine. Resolution of the question requires an interpretation of K.S.A. 8-244 and a definition of the scope of authority it confers upon law enforcement officers.

The statute provides:

"Every licensee shall have his or her driver's license in his or her immediate possession at all times when operating a motor vehicle, and shall display the same, upon demand of any officer of a court of competent jurisdiction or any peace officer, examiner or officer of the division of vehicles. . . ."

This precise issue has not previously been before this court. Many jurisdictions have wrestled with the question of at what point does a driver's license check become an unreasonable seizure contrary to the Fourth and Fourteenth Amendments. Some jurisdictions have held the type of spot check herein to be an unwarranted intrusion. A case typical of this rationale is *Commonwealth v. Swanger,* 453 Pa. 107, 307 A.2d 875 (1973). In *Swanger,* the Pennsylvania court specifically held that the right of an individual to be free from government intrusions without apparent reason outweighed the interest of the public in insuring safety on the highways. The Pennsylvania court said:

"The crux of our decision that a stop of a single vehicle is unreasonable where there is no outward sign the vehicle or the operator are in violation of The Vehicle Code, goes to the Commonwealth's argument the police need no justification to stop the vehicle. We rule before the government may single out one automobile to stop, there must be specific facts justifying this intrusion. To hold otherwise would be to give the police absolute, unreviewable discretion and authority to intrude into an individual's life for no cause whatsoever." (453 Pa. at 112.)

The issue is presently before the United States Supreme Court in *State v. Prouse,* 382 A.2d 1359 (Del. 1978), *cert. granted* _____ U.S. _____ (47 U.S.L.W. 3188, Oct. 3, 1978).▌

Sandy argues that his vehicle could only properly have been stopped if the officer had probable cause to believe he was in violation of the law. We do not construe the statute that narrowly. This statute is intended to give the officers mentioned therein the power to enforce driver's license laws. The licensing laws are safety measures applicable to the use of all roads or highways within the state. It would be most unusual to have an observable indication of a licensing violation of a moving vehicle.

The only practical method of enforcing the licensing laws involved is by stopping the vehicle. The inconvenience experienced by the individual motorist is relatively slight compared to the benefits to be derived from strict enforcement of our licensing laws. Whether this should be accomplished by spot checks or road blocks is a question that has been raised. Certainly there is less inconvenience to the motoring public by using spot checks. Spot checks also have the advantage of always being unexpectedly possible. We believe occasional spot checks are not only more practical but can have a salutary effect in the enforcement of our traffic laws and serve to promote the safety of the traveling

public. Excessive spot checks can be unduly burdensome to traffic and commerce. The line of demarcation between the two is not easily drawn. However, due regard for the practical necessities of effective driver licensing enforcement requires a brief stop or detention for checking purposes. It is a matter of balancing between the governmental interest in the safety of users of the highways and the individual's right to freedom and privacy.

The District of Columbia Court of Appeals in *Palmore v. United States,* 290 A.2d 573 (D.C. 1972), *cert. denied as to license check, aff'd on jurisdictional grounds,* 411 U.S. 389, 36 L.Ed.2d 342, 93 S.Ct. 1670 (1973), upheld procedure similar to that followed in this instance. Two District of Columbia officers in an unmarked car, recognizing that the car the defendant was driving was a rental car, decided to run a spot check to determine if the defendant had a proper license and a rental agreement (equivalent to proper registration). Defendant had committed no traffic offense and his auto had no apparent equipment defect. The stop was solely to check the operator's license and the vehicle registration. During the stop, one of the officers in the course of flashing his flashlight in the vehicle noted the presence of a trigger mechanism of a pistol protruding out from beneath the arm rest on the front seat of defendant's car. He removed the pistol and after learning it was unregistered, placed the defendant under arrest. The narrow issue posed in that case was whether the officers could stop the defendant and demand his license and registration when they had not seen defendant violate a traffic or vehicular equipment regulation and had no cause to believe that he was about to engage in any criminal activity. The government argued that the right to stop was a duty mandated by Congress. The officers had a right to require the driver to produce his license and vehicle registration without the need of first having reasonable suspicion that the driver lacked those particular documents. The following from that case is pertinent herein:

"At the outset, we reject the rigid rule which appellant urges us to adopt: That a police officer may stop an automobile for a spot check of the driver's license and the car's registration *only* when he has articulable suspicion, as defined by *Terry* [*v. Ohio,* 392 U.S. 1, 20 L.Ed.2d 889, 88 S.Ct. 1868 (1968)], that either of such documents is invalid. The touchstone of the fourth amendment is reasonableness. It seems to us in this age of the motor car that when the community's interest in limiting use of its highways to licensed drivers in registered autos is balanced against the momentary interruption of the motorist which is necessary to ascertain whether he is complying with these licensing requirements such intrusion is *not* so unreasonable as to be violative of the fourth amendment.

"We must keep in mind that if we were to limit the police, as appellant urges, to stopping *only* those autos in which the driver might reasonably be suspected to be without a license, for example, because of his youthful appearance, the result would unjustifiably single out and discriminate against certain groups of citizens, *i.e.,* the young. Moreover, such a restrictive ruling by us might render virtually unenforceable the Congressional prohibition against *all* unlicensed drivers and unregistered cars driving on District of Columbia streets. After all, persons who drive in the District without a valid license and registration will not necessarily exhibit conduct or the appearance giving rise to articulable suspicion that they are without proper driving credentials. Thus, they would be immune from the 'spot check' to enforce a requirement deemed necessary by Congress for public safety on the District's highways." (290 A.2d at 582.)

See also *State v. Holmberg,* 194 Neb. 337, 231 N.W.2d 672 (1975).

A routine license check and its concomitant temporary delay of a driver does not constitute an arrest in a legal sense where there is nothing arbitrary or harassing present. When the driver has produced his license and it is in proper form, he must be promptly allowed to continue on his way. It is only when the officer becomes aware of a reasonable probability of a law violation that the driver may be detained for further questioning.

In the case before us the officer observed the scales while lawfully making a driver's license check. These scales were in plain view and the officer had reasonable cause to believe they were stolen property. The seizure of the scales and the subsequent search of the vehicle with Sandy's consent were entirely proper. The trial court erroneously suppressed the evidence seized from the Sandy vehicle.

The judgment of the trial court is reversed and the case is remanded.

PRAGER, J., dissenting: I respectfully dissent. I cannot agree with the holding of the majority that, on the strength of K.S.A. 8-244, a law enforcement officer may stop any motorist at random at any time and at any place on the public highways, streets, or roads of the state of Kansas without any articulable reason to suspect that he has violated any law, but simply for the avowed purpose of checking his driver's license. In my judgment, the holding of the majority violates the constitutional protections provided by the Fourth Amendment to the United States Constitution and Section 15 of the Kansas Bill of Rights which guarantee the right of the people to be secure against unreasonable searches and seizures.

It is a frightening experience for some people to be stopped by a police officer. I would not subject any citizen to such a procedure without some good, sound reason. At the very least, in order to stop at random a moving automobile, a police officer should be required to have some expressible and reasonable suspicion that some violation of law has been, is being, or is about to be committed.

The stopping of an automobile by police officers is a seizure within the protections provided by the United States Constitution and the Kansas Bill of Rights. *United States v. Martinez-Fuerte,* 428 U.S. 543, 49 L.Ed.2d 1116, 96 S.Ct. 3074 (1976); *Almeida-Sanchez v. United States,* 413 U.S. 266, 268, 37 L.Ed.2d 596, 93 S.Ct. 2535 (1973). The issue presented here is whether the stopping of the defendant's automobile was a reasonable seizure in light of the constitutional standards. In *Terry v. Ohio,* 392 U.S. 1, 20 L.Ed.2d 889, 88 S.Ct. 1868 (1968), the United States Supreme Court extended the Fourth Amendment prohibition of unreasonable searches and seizures to a brief detention and interrogation by police officers, without a warrant, of an individual on a public street. In struggling with the determination of the reasonableness of police confrontation of citizens, the *Terry* court adopted the "balancing" language of *Camara v. Municipal Court,* 387 U.S. 523, 18 L.Ed.2d 930, 87 S.Ct. 1727 (1967), and held that, to assess the reasonableness of an investigatory stop, it is necessary to focus upon the governmental interest which allegedly justifies the official intrusion upon the constitutionally-protected interests of the private citizen and balance the need to seize against the invasion which the seizure entails. After considering the governmental and individual interests, the Supreme Court set forth a minimum constitutional standard for investigative stops of persons by police officers—the police officer must be able to point to "specific and articulable facts which, taken together with rational inferences from those facts," reasonably warrant the stop. In adopting the above standard, the Supreme Court expressly rejected the state's contention that an investigative stop amounted to no more than a "minor inconvenience and petty indignity" which can properly be imposed upon the citizen on the basis of the officer's mere suspicion.

The majority opinion correctly recognizes the legitimate state interest in maintaining safe Kansas highways. Unfortunately, it

does not give proper consideration to either the right of the individual motorist to be free of unnecessary governmental interference or the potential for abuse present in a discretionary spot check. Although the majority's characterization of the stopping of an automobile as a "relatively slight" governmental interference seems much like the state of Ohio's "minor inconvenience" contention rejected by the court in *Terry v. Ohio,* it is more disturbing to me that the majority opinion has failed to give more serious consideration to the potential for abuse inherent in a situation where an individual police officer is given complete discretion to select arbitrarily an individual motorist to be stopped to have his driver's license checked.

In both of the decisions cited by the majority in support of its position (*State v. Holmberg,* 194 Neb. 337, 231 N.W.2d 672 [1975]; *Palmore v. United States,* 290 A.2d 573 [D.C. 1972], *cert. denied as to license check, affirmed on jurisdictional grounds,* 411 U.S. 389 [1973]), the courts recognized the potential for abuse and stated that if the stop were used as a mere pretext for other reasons, it would violate the Fourth Amendment. Although the majority opinion's implied warning against arbitrary or harassing activity by the police is commendable, it is a practical impossibility to detect or deter such activity on appellate review. As pointed out in the dissenting opinion in *Holmberg,* the mere pronouncement of the magic words, "I wanted to check the registration and driver's license" becomes the "open sesame" which removes all constitutional barriers to a random investigative stop of any motor vehicle at any time, any place, or at the arbitrary whim of any police officer. For similar observations see also *United States v. Montgomery,* 561 F.2d 875 (D.C. Cir. 1977) and cases cited in footnote 16 at page 884; *State v. Ochoa,* 112 Ariz. 582, 544 P.2d 1097 (1976); *State v. Prouse,* 382 A.2d 1359 (Del.), *cert. granted* _____ U.S. _____ (1978)▮; *State v. Bonds,* 59 Hawaii 130, 577 P.2d 781 (1978); *People v. James,* 44 Ill. App. 3d 300, 3 Ill. Dec. 88, 358 N.E.2d 88 (1976); *State v. McKinley,* 305 Minn. 297, 232 N.W.2d 907 (1975); *State v. Johnson,* _____ Minn. _____, 257 N.W.2d 308 (1977); *People v. Ingle,* 36 N.Y.2d 413, 369 N.Y.S.2d 67, 330 N.E.2d 39 (1975); *Commonwealth v. Swanger,* 453 Pa. 107, 307 A.2d 875 (1973).

The Supreme Court of Delaware in *State v. Prouse,* 382 A.2d at

1364, used the following language in rejecting the holding which the majority has adopted in this case.

"We recognize the legitimate state interest in enforcing licensing and registration laws, and note that in fact situations similar to that of the present case other courts have reached the conclusion that the state interests outweigh the interests of the individual. . . . However, the factor which in our opinion makes random stops, absent justifying facts, unreasonable is the inherent arbitrariness of the procedure. The flaw in the process is that absolute discretion and authority is conferred upon the police to detain whomever they desire for whatever reason on the pretense of a documents check stop. Thus an officer prejudiced against any visibly identifiable group could stop a disproportionate number of persons in the group. No discrimination has been shown in the stop under examination here, but the evil of the possibility of discriminatory stops does exist. If we were to accept the State's position, discriminatory stopping procedures could be practiced with little or no chance for judicial review.

"It has been asserted that a rigid invalidity rule as we adopt here is too broad, and that only where actual discriminatory intent is shown to have motivated the stopping officer, or where a license check is used as a pretext to investigate unrelated crime, should the random stop be illegal. . . . However, burdening a criminal defendant with the task of proving that a police officer acted with an illegal subjective intent would as a practical matter emasculate any limited rule concerning random stopping procedures, and in turn, emasculate Fourth Amendment rights."

I cannot agree with the holding of the majority in this case because, it, in fact, emasculates the constitutional protections of the Fourth Amendment and the Kansas Bill of Rights against unreasonable searches and seizures as applied to persons driving motor vehicles.

There is another reason why I cannot accept the holding of the majority, even if we ignore the constitutional objections discussed above. The majority opinion's reliance upon K.S.A. 8-244 as a basis for the holding is not justified. That statute, on its face, requires only that a licensed driver have his driver's license in his immediate possession while driving and that the driver display the license upon the demand of a police officer. The statute has nothing to do with the granting of power to a police officer to stop a moving motor vehicle. It neither expressly nor by implication authorizes a police officer to stop at random any motor vehicle to inspect the motorist's driver's license. Likewise K.S.A. 8-244 does not purport to furnish guidelines in determining when a policeman may stop an automobile. The proper guidelines are in fact specifically mandated by the legislative standards prescribed in K.S.A. 22-2402(1) as follows:

"22-2402. Stopping of suspect. (1) Without making an arrest, a law enforcement officer may stop any person in a public place whom he reasonably suspects is

committing, has committed or is about to commit a crime and may demand of him his name, address and an explanation of his actions."

The enactment of K.S.A. 22-2402(1) was a legislative adoption of the rule of *Terry v. Ohio* (Judicial Council comment following the statute). Although *Terry v. Ohio* involved "the stop" of a person on foot, in my judgment, the Fourth Amendment protections codified in K.S.A. 22-2402(1) have a broader applicability and should be applied to the stopping of an automobile as well as to the stopping of a pedestrian.

In examining the present constitutional and statutory limitations upon the actions of police officers, I am convinced that the police have sufficient tools to enforce the laws of the state of Kansas without subjecting the citizens of this state to the stopping of their motor vehicles at the unbridled discretion of an individual police officer. The Kansas cases interpreting the "reasonable suspicion" standard of *Terry* and K.S.A. 22-2402(1) have allowed the police a broad discretion to stop particular automobiles in their investigation of suspicious activities. For example in *State v. Holthaus,* 222 Kan. 361, 564 P.2d 542 (1977), the police observed the defendant on two occasions driving by the scene of a burglary in the early morning hours. The defendant, who appeared very interested in the burglary location, became nervous upon seeing a marked police car, pulled into a savings and loan parking lot, and scooted down in the seat. The court held the police had a reasonable suspicion to investigate. We have also held that an officer seeing a vehicle similar to that described in a police broadcast has a reasonable suspicion sufficient to justify the stopping of the vehicle. *State v. Morin,* 217 Kan. 646, 538 P.2d 684 (1975); *State v. Kearns,* 211 Kan. 158, 505 P.2d 676, *cert. denied,* 414 U.S. 841 (1973); *State v. Roberts,* 210 Kan. 786, 504 P.2d 242 (1972). In *State v. Undorf,* 210 Kan. 1, 499 P.2d 1105 (1972), the stopping of a car which the police had observed spinning its wheels and swerving over the center line was held to be based upon a reasonable suspicion. In *State v. Kelly,* 203 Kan. 360, 454 P.2d 501 (1969), a reasonable suspicion was found in the presence of the defendant's vehicle shortly after an early morning robbery within four miles of the robbery location when the police observed two of the occupants wearing clothing similar to those described in the police broadcast of the robbery.

An important case on this subject is *City of Garden City v. Mesa,* 215 Kan. 674, 527 P.2d 1036 (1974). There the police officers observed the defendant standing in the doorway of a shop in the business district of Garden City at 4:00 a.m. The lights in the shop were on, but the front door was closed. It was held that the police had reasonable suspicion sufficient to satisfy the requirements of K.S.A. 22-2402(1). *Mesa* is important because, in the opinion, it is emphasized that a reasonable suspicion is required before a citizen can be stopped by the police. In *State v. Jackson,* 213 Kan. 219, 515 P.2d 1108 (1973), however, this court held that the stopping of a person walking along a highway at 2:50 in the morning was unreasonable since the police officer did not observe any suspicious actions on the part of the defendant or anything suspicious about his appearance.

Under Kansas law as it existed prior to this case, police officers were permitted to stop a motorist only if the police officer had probable cause to believe that a violation of the law had occurred or if the police officer had some articulable and reasonable suspicion that a person was committing, had committed, or was about to commit a crime or if the police officer stopped the automobile along with other approaching vehicles at a roadblock to check the motorist's driver's license in a systematic *nondiscretionary* manner. *State v. Frizzell,* 207 Kan. 393, 485 P.2d 160 (1971).

I am convinced that the above guidelines reflect a reasonable balancing of governmental and individual interests. In order to carry out their duties, the police do not need the unlimited authority to stop indiscriminately individual motorists in order to check their drivers' licenses. The granting of such power, in my opinion, unduly infringes upon the personal liberties of our citizens. I would affirm the trial court's judgment suppressing the evidence for the reason that it was obtained as the result of an illegal search and seizure which arose from the unlawful stopping of the defendant's motor vehicle.

SCHROEDER, C.J. and HOLMES, J., join the foregoing dissenting opinion.