No. 63,612

STATE OF KANSAS, *Appellee*, v. BRIAN BAILEY, *Appellant.*

(799 P.2d 977)

Opinion filed October 26, 1990.

*Jessica R. Kunen*, chief appellate defender, argued the cause and was on the briefs for appellant.

*Hiram E. Blomquist*, assistant district attorney, argued the cause, and *Paul J. Morrison*, district attorney, and *Robert T. Stephan*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

MCFARLAND, J.: Brian C. Bailey appeals his jury trial convictions of first-degree felony murder (K.S.A. 21-3401) and four counts of aggravated robbery (K.S.A. 21-3427).

Specifically, the convictions were for the:

1. December 8, 1986, aggravated robbery of a Workingman's Friend gas station in Lenexa and the killing of its attendant, George Woods;

2. December 15, 1986, aggravated robbery of a 7-Eleven convenience store in Prairie Village;

3. December 15, 1986, aggravated robbery of the Ensminger Retail Liquor Store in Lenexa; and

4. December 23, 1986, aggravated robbery of a Vickers gas station in Overland Park.

For his first issue, defendant contends that the police officer stopping his vehicle had no reasonable suspicion for doing so; that the subsequent search and detention were improper; and that all evidence arising therefrom, including defendant's statements, should be suppressed.

At approximately 9:15 a.m., on December 24, 1986, George Kennedy, a Shawnee police officer, was driving east on 67th Street on routine traffic patrol. On his radio he heard a dispatch that an aggravated robbery and shooting had just occurred at a Workingman's Friend gas station in Merriam at 67th and Carter Streets. The perpetrator was described as a black male wearing a yellow baseball cap who ran south from the scene of the crime. Officer Kennedy's location was close to the crime scene. He activated his red lights to speed his progress and headed for the crime scene. His purpose was to look for suspicious activity associated with the crime and to assist in the search of the area. While so proceeding, his attention was caught by a brown pickup truck which was westbound on 67th Street. The vehicle was equipped with oversize tires and was considerably taller than the police car. As the vehicles passed, the officer was only able to see the driver's head and shoulders. The driver was a young black male who was described by the officer as nervously looking from side to side as though looking for something. The driver turned and looked at the officer and made an abrupt and unsignalled left-hand turn. The officer made a U-turn and stopped the truck after it had made another turn.

The driver and sole occupant of the truck, defendant herein, was immediately advised that he was stopped as a part of the investigation of the recent robbery and was read his *Miranda* rights. Defendant gave the officer a California driver's license which a radio records check disclosed was not of record. The records check also disclosed defendant had an expired Kansas driver's license. Defendant gave a Leavenworth Road address and

then gave a different address. Defendant gave varying reasons for why he was in the area. A Merriam police officer had arrived on the scene. In separate consents to each officer, the defendant consented to a search of the truck. In the truck the officers found a bag hanging from the headlight switch which contained .22 caliber and .32 caliber ammunition. Two wallets and checkbook covers were also found as well as four traffic citations issued to a Kohler Jeffries.

Defendant was transported to the Merriam police headquarters. A records check had revealed defendant and Kohler Jeffries had previously been arrested for aggravated robbery. The perpetrator of the December 24 crime had been described as a tall black male. Defendant was apparently not particularly tall. Proceeding on the theory that defendant's conduct as observed by Officer Kennedy and the circumstances surrounding the stop were consistent with defendant having served as the "wheelman" for the robber, Johnson County District Attorney Dennis Moore was telephoned. Defendant was granted immunity for the December 24 robbery and shooting in exchange for information on the person actually committing same. Defendant advised he had in fact served as the wheelman for Kohler Jeffries, who had committed those crimes. In a later statement, he implicated himself and Jeffries in the three robberies occurring on December 15 and 23, 1986. These statements and the immunity granted will be discussed in greater detail elsewhere in this opinion.

Defendant sought suppression of all evidence and statements obtained as a result of what he contended was an illegal arrest, search, and detention.

The trial judge, after a hearing extending over several days, made extensive findings of fact consistent with the facts set forth herein and concluded:

"That the stop and detention of the defendant was lawful in that the officer had a reasonable and articulable suspicion based on his knowledge at that time of the crime that had occurred; the description, albeit sketchy, of the perpetrator; the actions of the defendant at the time the officer first observed defendant, the officer's three-plus years experience, the officer's training regarding patterns of people which allows the officer to determine inferences and deductions which might elude an untrained person which together make up the totality of the circumstances existing at that time pursuant to *U.S. v. Cortez*, 449 U.S. 411, 66 L. Ed 2d 621 [, 101 S. Ct.

690] (1981) and *State v. Baker*, 239 Kan. 403, 407, 720 P.2d 1112 (1986). The officer once having reasonable suspicion defendant was involved in the crime, the officer could legally stop and detain the defendant and to demand his name, address and an explanation of his actions pursuant to K.S.A. 22-2402(1) and *City of Garden City v. Mesa*, 215 Kan. 674, 527 P.2d 1036 (1974). The Court finds that the two tests set out in the *Cortez* case have been satisfied, and that the officer had probable cause for the arrest and search. The Court finds that the searches of the defendant's vehicle were lawful based upon the voluntary consent of the defendant. *Schneckloth v. Bustamonte*, 412 U.S. 218, 36 L. Ed. 2d 854, 93 S. Ct. 2041 (1973), *U.S. v. Shields*, 573 F.2d 18 (10th Cir. 1978)."

The defendant's motions for suppression and dismissal were denied.

The key question in this issue is the validity of the stop. Unless tainted by an illegal stop, the search was clearly consensual and the detention justified.

K.S.A. 22-2402(1) now provides:

"(1) Without making an arrest, a law enforcement officer may stop any person in a public place whom such officer reasonably suspects is committing, has committed or is about to commit a crime and may demand of the name, address of such suspect and an explanation of such suspect's actions." L. 1990, ch. 106 § 1.

In *State v. Baker*, 239 Kan. 403, 407, 720 P.2d 1112 (1986), we stated:

"[A] stop and frisk under *Terry* [*v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968),] and K.S.A. 22-2402 requires that the officer have a reasonable and articulable suspicion, based on facts known to him or her prior to the stop, that the individual stopped has committed, is committing, or is about to commit a crime."

*State v. Guzy*, 139 Wis. 2d 663, 407 N.W.2d 548, *cert. denied* 484 U.S. 979 (1987), contains an excellent discussion of the constitutional limits to a police officer's right to stop a suspect. In *Guzy*, a store was robbed. Thirty minutes later officers heard a dispatch about the robbery stating the robber was a white male with long hair and other characteristics not relevant to the case. The officers then saw a vehicle in which two white males with long hair were riding. No suspicious conduct was observed. The officers concluded that the robber could be one of the men, based on the time and distance from the crime scene and that the occupants did have long hair. They stopped the vehicle. The case

contains an excellent summary of the applicable law. The *Guzy* court stated, in part:

"Though stopping a vehicle and detaining its occupants constitutes a seizure within the meaning of the fourth amendment, *see [Delaware v.] Prouse*, [440 U.S. 648, 653, 59 L. Ed. 2d 660, 99 S. Ct. 1391 (1979)], certain investigative stops, prompted by an officer's suspicion that the occupants have committed a crime, may in certain circumstances be constitutionally permissible even though the officer lacks probable cause to arrest. *United States v. Hensley*, 469 U.S. 221, 226, [83 L. Ed. 2d 604, 105 S. Ct. 675] (1985). The test is an objective test. Law enforcement officers may only infringe on the individual's interest to be free of a stop and detention if they have a suspicion grounded in specific, articulable facts and reasonable inferences from those facts, that the individual has committed a crime. *Id.*, *Wendricks v. State*, 72 Wis. 2d 717, 723, 242 N. W. 2d 187 (1976). An 'inchoate and unparticularized suspicion or "hunch" . . .' will not suffice. *Terry v. Ohio*, 392 U.S. 1, 27, [20 L. Ed. 2d 889, 88 S. Ct. 1868] (1968).

"This test focuses on the reasonableness of the governmental intrusion. It 'balances the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion.' *Hensley*, 469 U.S. at 228. The societal interest implicated is the ability of law enforcement officers to make an investigative stop when a crime has been recently committed which thereby promotes the strong societal interest in 'solving crimes and bringing offenders to justice.' *Id.* at 229.

. . . .

"The State concedes that the only physical feature linking the passenger to the armed robbery was his dark shoulder length hair. An additional fact present was that the truck was spotted in a location and at a time that would be consistent if a vehicle had been utilized by the armed robber to flee the scene. These are the only 'specific and articulable' facts known to the officer at the time of the arrest. But these facts did not exist in a vacuum. There [were] present at the time other factors. First, there was no alternative means of further investigation available to the officer short of actually making the stop. Second, if the officer did not react immediately, the opportunity for further investigation would be lost. Third, the description known to the officer would allow him to quickly determine the presence or absence of these features with minimal intrusion to the passenger.

"We conclude that the presence of these further circumstances are relevant in determining the weight to be given to the known facts in deciding the question of the reasonableness of the investigative stop. Inasmuch as the focus is on reasonableness, the presence or absence of these circumstances can bear on the weight that can reasonably be given to the known fact or facts. Are alternative means of further investigation available, such as a license plate check, closer observation of the suspects, or obtaining additional information? If so, the reasonableness of the stop based on scant facts may well be questionable. Is there a possibility that if law enforcement officers

do not act immediately the opportunity for further investigation would be lost? A minimal amount of facts may, under these circumstances, be given greater weight than if the opportunity to act in the future is not foreclosed. What actions would be necessary following the stop for law enforcement officers to determine whether to arrest or release the suspected individual? Will the stop create the opportunity to corroborate a known physical feature of a suspect or clothing description with minimal intrusion on personal security?

"We conclude that the reasonableness of an investigative stop depends upon the facts *and* circumstances that are present at the time of the stop. Given a triggering fact or facts of suspicion, law enforcement officers and reviewing courts may also consider the circumstances that were present in determining the weight to be given those facts in making the balance between the intrusion and the societal interest.

"In sum, a balance must be struck between the interests of society in solving crime and bringing offenders to justice and the rights of members of that society to be free from unreasonable intrusion. Our conclusion strikes that balance. The focus is on reasonableness. It is, under many circumstances, a very difficult test to apply, particularly by a law enforcement officer confronted with a situation in which he or she may have but a few seconds in which to make a determination. It is impossible to write a black letter rule that governs law enforcement officers' conduct under such circumstances. It is a rule of reasonableness: was the action of law enforcement officers reasonable under all the facts and circumstances present?" 139 Wis. 2d at 675-79.

Much stronger facts for finding the stop reasonable exist in the case before us. The robber left the scene running, but the officer's training, experience, and knowledge of the area satisfied him that the robber would have planned access to transportation in order to escape—either by a previously placed vehicle or by a rendezvous with an accomplice. The proximity of time and place with the crime scene was very close. Like *Guzy*, only a sketchy description was involved. But the officer made the stop based on the location, time, description and suspicious behavior of defendant, and the need for immediate action. The facts are also much stronger than those involved in *State v. Guy*, 242 Kan. 840, 752 P.2d 119 (1988), where officers followed suspected drug dealers for four hours until stopping the same for speeding. We held that observation of the speeding violation was sufficient for the stop even through the speeding was, in essence, a fortuitous happenstance for the narcotics officers following the vehicle.

We find no error or abuse of discretion in the trial court's determination that Officer Kennedy had a reasonable and articulable suspicion based upon facts known prior to the stop and the circumstances present that the defendant was involved in the recent robbery in the area. The stop was, accordingly, reasonable.

For his second issue, defendant contends the grant of immunity given for the December 24, 1986, robbery precluded subsequent interrogations as to other crimes.

This is really an offshoot of a matter previously before us. The charges herein against defendant were originally filed in case No. K-52874. Judge Pro Tem Wayne J. Zuck dismissed the charges at the preliminary hearing therein on the basis the immunity granted to the defendant covered all charges and not just the crimes of December 24, 1986 (the Merriam Workingman's Friend robbery and shooting). The State refiled the charges (case No. K-53262). Judge Earle D. Jones dismissed the new charges based upon Judge Zuck's prior dismissal. The State appealed both dismissals. We reversed the dismissals in an unpublished opinion filed January 15, 1988, (consolidated appeals Nos. 60,676 and 60,688) and ordered the complaints in case No. K-53262 (the case herein) reinstated. We held:

"The immunity granted to the defendant did not include subsequent statements made by the defendant nor his participation in the offenses that occurred on December 8, 15, and 23, 1986. Since the trial court made no finding that the subsequent interrogations were a result of information obtained from the defendant's first statement, his later statements or any evidence obtained therefrom would not be precluded by the grant of immunity given to him."

The second sentence in the above quotation from the earlier opinion spawns this issue herein.

On remand, the issue was presented to the trial court as to whether the information provided by the defendant was used to obtain information on the December 8, 15, and 23 crimes. The trial court found:

"[T]he interrogations of the defendant regarding the crimes committed December 24, 1986, were limited to those matters and were not used to obtain information through interrogation of the defendant concerning the crimes which occurred December 8, 15 and 23, 1986. . . .

. . . .

"The Court finds that the oral grant of immunity by the District Attorney was valid and lawful and that such grant of immunity was valid only for the crimes committed December 24, 1986.

"The Court further finds that all of the defendant's confessions were given without compulsion, coercion, threats or any incapacitation of the defendant and further that defendant was properly and legally warned of his constitutional rights pursuant to the *Miranda* decision, and that the defendant freely and knowingly and voluntarily waived those rights."

There were a total of five aggravated robberies. The immunity was given for the December 24 robbery and no other crimes. Later, defendant was interrogated as to the other robberies. These were separate and different crimes.

Defendant cites *Kastigar v. United States*, 406 U.S. 441, 32 L. Ed. 2d 212, 92 S. Ct. 1653 (1972), for the proposition that the State has the burden to show that all the evidence of the other crimes came from a source independent of that covered by the statement for which immunity was granted. A reading of *Kastigar* shows its inapplicability herein. The *Kastigar* case involved individuals who were granted immunity and then subpoenaed to testify before a grand jury. They refused to testify on the basis of their Fifth Amendment rights against self-incrimination and were found to be in contempt of court. The case concerned whether the unwilling witnesses could be compelled to testify and to what extent such testimony could be used in subsequent prosecutions against those witnesses as to matters to which they had testified.

The sentence in our earlier opinion spawning this issue was unfortunate, added nothing to the opinion, and only served to create this non-issue. It was the intention of the earlier opinion to determine and dispose of the scope of the immunity issue in this case, not to expand it for reconsideration on remand.

For his third issue, defendant contends the district court erred in refusing to accept Judge Zuck's prior order suppressing evidence based on alleged Fourth Amendment violations.

As will be recalled, we reversed Judge Zuck's order of dismissal, which was based in part upon the stop (case No. K-52874), and reversed Judge Earle Jones' dismissal (case No. K-53262), which was based on Judge Zuck's prior order. The issue before us was the scope of immunity question. We remanded case No. K-53262 with directions that the complaint be reinstated and that it "pro-

ceed in conformity with this opinion." We further specifically stated that the "court in its discretion" could reentertain the motion to suppress on remand. The motion was heard by Judge Robert Jones because the matter did not come up until the case had been assigned to him for trial.

A somewhat similar situation occurred in *State v. Riedel*, 242 Kan. 834, 752 P.2d 115 (1988). We stated therein:

"We think Judge Russell, as the judge actually presiding at the trial, acted properly in determining she should make the final determination as to the admissibility of evidence at the trial, even though there had been an earlier ruling on the same evidence at a pretrial motion hearing. While in most cases district judges should be reluctant to rehear an issue decided earlier in the proceedings, reconsideration of such an issue lies within the sound discretion of the trial judge. Reconsideration of earlier pretrial rulings, when necessary to prevent prejudice and assure the parties a fair trial, cannot be said to be an abuse of the trial court's broad discretion. Cf. *State v. Quick*, 226 Kan. 308, 597 P.2d 1108 (1979). No abuse of discretion on the part of Judge Russell has been shown in this case." 242 Kan. at 838.

We find no error in this issue.

For his fourth issue, defendant contends the trial court erred in refusing to instruct on the lesser degrees of homicide.

Defendant was charged with first-degree murder in both of its forms—premeditated and felony. The jury was instructed only on first-degree felony murder. On appeal, defendant contends the instructions on the lesser degrees of homicide should have been given.

The trial court has an affirmative duty to instruct the jury on all lesser included offenses which are supported by the evidence. K.S.A. 21-3107(3); *State v. Cummings*, 242 Kan. 84, 91, 744 P.2d 858 (1987); *State v. Marks*, 226 Kan. 704, 713, 602 P.2d 1344 (1979); *State v. Weyer*, 210 Kan. 721, 725-27, 504 P.2d 178 (1972). Instructions on lesser included offenses must be given even though the evidence supporting those offenses may not be strong. *State v. Roberson*, 210 Kan. 209, Syl. ¶ 1, 499 P.2d 1137 (1972).

In *State v. Strauch*, 239 Kan. 203, Syl. ¶ 7, 718 P.2d 613 (1986), we held:

"When murder is committed during the commission of a felony, the rule requiring instructions on lesser included offenses does not apply. The felonious conduct is held tantamount to the elements of deliberation and premeditation which are otherwise required for first-degree murder. It is

only when the evidence that the underlying felony was committed is weak, inconclusive, or conflicting that instructions on lesser included offenses may be required."

The evidence was very strong that the killing of George Woods occurred during the commission of the felony of aggravated robbery. Kohler Jeffries testified that he and the defendant participated in the robbery with Jeffries serving as the wheelman. Jeffries stated defendant returned to the car after the robbery stating he had shot the attendant. The defendant did not testify and presented alibi witnesses.

We find no error in the failure to instruct the jury on the lesser offenses of homicide.

For his fifth issue, defendant contends the trial court erred in excluding evidence of a car seen leaving the scene of the crime.

Theresa Petty told a police officer that she had seen a small yellow car rapidly leaving the scene of the December 8, 1986, robbery and murder shortly after the crimes occurred. Defense counsel sought to introduce this information through police officers. Defendant contends this evidence was offered not to show the truth of the matter asserted but "to show what the officer did in his investigation." In support of his position, defendant cites cases involving testimony as to what a police officer did in response to police radio dispatches. *State v. Hall*, 220 Kan. 712, 717, 556 P.2d 413 (1976); *State v. Ritson*, 215 Kan. 742, 748, 529 P.2d 90 (1974); *State v. Hollaway*, 214 Kan. 636, 639, 522 P.2d 364 (1974); *State v. Trotter*, 203 Kan. 31, 453 P.2d 93 (1969). These are clearly inapplicable here.

K.S.A. 1989 Supp. 60-460 provides, in part:

"Evidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated, is hearsay evidence and inadmissible."

The evidence in the case before us was clearly being offered for the truth of the matter stated.

We find no error in the trial court's exclusion of this proffered testimony.

For his final issue, defendant contends his convictions of felony murder and the underlying crime of aggravated robbery constitute double jeopardy.

In *State v. Dunn*, 243 Kan. 414, 758 P.2d 718 (1988), defendant argued on appeal, *inter alia*, that her convictions for aggravated robbery and felony murder constituted double jeopardy. We rejected this argument and set forth the test for determining when multiple convictions violate the prohibition against double jeopardy:

"The constitutional prohibition against double jeopardy is directed to the identity of the offense and the act. Where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied when determining whether there are two offenses or only a single offense is whether each statutory provision requires proof of an element that the other does not. Where one statute provides proof of an element that the other does not, the crimes are not the same, even though proof of the separate crimes may substantially overlap." 243 Kan. at 432.

*State v. Gonzales*, 245 Kan. 691, 783 P.2d 1239 (1989), recently considered this same double jeopardy claim and adhered to our prior law. Defendant concedes in his reply brief that our prior decisions have decided this issue adversely to his position. He "requests consideration of this issue in order to exhaust his state remedies."

We adhere to our prior decisions as expressed in the *Dunn* and *Gonzales* cases.

The judgment is affirmed.

ALLEGRUCCI, J., dissenting: I respectfully dissent from the majority's holding that the stop by the police officer was reasonable. I agree with the statement of law expressed by the majority as to the officer's right to make an investigative stop, but disagree with the application of that law to the facts in the present case.

In my opinion, the stop by the officer was unreasonable. The majority relies upon *State v. Guzy*, 139 Wis. 2d 663, 407 N.W.2d 548, *cert. denied* 484 U.S. 979 (1987). In *Guzy*, the Wisconsin Supreme Court set forth six relevant factors which must be considered in determining the reasonableness of such a stop: (1) particularity of description of offender or vehicle in which he fled; (2) size of area in which offender might be found, as indicated by such facts as elapsed time since crime occurred; (3) number of persons about in that area; (4) known or probable direction of offender's flight; (5) observed activity by particular person stopped; and (6) knowledge or suspicion that person or vehicle

stopped has been involved in other criminality of type presently under investigation. 139 Wis. 2d at 677. The *Guzy* court applied these factors and the surrounding circumstances in determining the stop was legal.

I take issue with the majority's statement that "[m]uch stronger facts for finding the stop reasonable exist in the case before us." In *Guzy*, the description of the robber was broadcast over police radio as a white male with long, dark, shoulder-length hair and a beard, 5'5" to 5'8" in height, a slim build, wearing sunglasses and a blue vest with red stripes. No description was given of the getaway vehicle. The vehicle was observed and stopped at approximately 2:30 a.m. In arriving at its conclusion, the *Guzy* court found the uniqueness of the shoulder-length hair, coupled with the fact that very few vehicles are on the streets at 2:30 a.m., to be significant. Further, this location of the stop was consistent with the time of the robbery and where the vehicle would be at that time. In addition, the surrounding circumstances were important to the court's conclusion. First, the officer received a "fairly specific physical description." 139 Wis. 2d at 682. Second, because the truck was traveling at highway speed at night, they could not verify the physical description short of stopping the truck. Third, the truck was traveling toward the Minnesota border, which was only two miles away.

In the present case, the defendant was observed and stopped at 9:15 a.m., a very busy time of day. The officer indicated traffic was moderate, with cars traveling in both directions. The district court found that the officer was approximately one-half mile from the scene of the robbery; he was not dispatched to the scene but proceeded eastbound on 67th Street with red light and siren on to look for anyone suspicious; the officer did not recall any particular traffic or driver until he noticed the defendant. The district court further noted:

"[T]he driver was not looking in the direction he was driving but appeared to be looking for someone, and that immediately after passing the officer the driver appeared to look back at the police vehicle and, without signaling, made an abrupt left turn in violation of the traffic code; that it was the officer's impression the defendant had not intended to make such a turn but had made the turn in response to observing the police officer."

An officer can make an investigative stop if he has a reasonable and articulable suspicion, based upon facts known prior to the stop, that the defendant has committed, is committing, or is about to commit a crime. The test is an objective one. Here, the only "suspicious fact" is that the defendant is black. That "fact," together with the defendant "nervously looking from side to side" as the patrol car passed and then making an abrupt left turn, is the only objective factual basis for the officer's stopping the defendant. Looking nervous would be a normal reaction for a driver when a patrol car approaches with the red light and siren on; nor is a left-hand turn indicative of one who is, has, or is about to commit a crime. I do not find that the sum of these facts constitutes the reasonable, articulable suspicion necessary to support an investigatory stop. If in the present case the robbery had been committed by a white male and a white male was observed driving the brown pickup, would a reasonable suspicion exist to support the stop? According to the majority, it would. Who then, under the majority's view, would be protected from such a stop? If one accepts the majority's view of the constitutional limits to making an investigative stop, the answer is no one. The majority focuses on the officer's subjective interpretations of the existing circumstances rather than facts known to the officer at the time of the stop. "Reasonable, articulable suspicion" to invade one's privacy by an investigative stop requires more than an officer's subjective belief. As noted by Chief Justice Heffernan in his dissent in *Guzy*, "In allowing a police officer's subjective determination to be taken into account, the majority elevates society's interest in apprehending offenders above the constitutional right to be free from unreasonable stops." 139 Wis. 2d at 684 (Heffernan, C.J., dissenting). In my opinion, the stop by Officer Kennedy was constitutionally impermissible, and I would reverse the district court.