No. 58,965

STATE OF KANSAS, *Appellee*, v. LISA DUNN, *Appellant*.

(758 P.2d 718)

Opinion filed July 8, 1988.

*Jessica R. Kunen*, deputy appellate defender, argued the cause, and *Benjamin C. Wood*, chief appellate defender, was with her on the briefs for appellant.

*Perry Murray*, former county attorney and special prosecutor, argued the cause, and *Robert T. Stephan*, attorney general, was with him on the briefs for appellee.

The opinion of the court was delivered by

LOCKETT, J.: Lisa Dunn, raising numerous issues, appeals (1) her convictions of two counts of felony murder, two counts of aggravated kidnapping, one count of aggravated robbery, one count of aggravated battery on a law enforcement officer, and one count of aggravated battery; and (2) the sentence imposed of four life terms, two terms of 15 to life, and one term of 5 to 15 years, all terms to run consecutively. The convictions arise from a series of crimes which ended near Colby, Kansas, in February 1985. After careful consideration of all the issues raised, we affirm Dunn's convictions and sentence.

Lisa Dunn was born and raised in Michigan. At 15, after consistently high academic performance, her behavior became erratic and she began to associate with a peer group that introduced her to substance abuse, particularly alcohol. At 17, Dunn left home and traveled to Florida, but returned home after she alleged she was raped while hitchhiking. Because Dunn refused to cooperate with the prosecution of the accused, the Florida police were forced to dismiss the charges against her alleged attackers.

Following Dunn's return to Michigan, a constant state of friction existed between Dunn and her parents. In December, 1984, she met Daniel Remeta. Believing Remeta to be a kind and considerate person, Dunn moved in with him in January 1985. Shortly thereafter, Dunn and Remeta, along with another friend

of Dunn's, Mark Walter, decided to travel to Florida. Before they could leave, Remeta was arrested for breaking into a car. Remeta's mother and Walter posted his appearance bond. Remeta decided to jump bond and leave for Florida. At Remeta's request, Dunn took a .357 Magnum pistol from her father's gun collection. Dunn later testified she felt she needed the gun to protect herself because of the prior rape.

Dunn claimed that it was on the way to Florida that she first learned about Remeta's prior prison record and discovered that he could be cruel and vindictive. She testified that when she told Remeta that she should return home, he threatened her with the gun, then warned her that he would hurt her or her family if she left him. This warning was later repeated. Remeta also played Russian Roulette with Dunn, sticking the barrel of the .357 in her mouth and holding it to the side of her head. Remeta began calling Dunn his "wife," picking out her clothes, and selling some of her possessions. Concerned about Remeta's erratic behavior, Dunn testified that she and Walter resolved that one of them should stay awake at all times. While in Florida, the trio visited Disney World and stayed with a friend of Remeta's mother.

In a two and one-half week crime spree, the three traveled from Florida through Texas, Arkansas, and Oklahoma to Kansas, committing a series of violent crimes, including several murders. Dunn maintained that she played no role in these crimes. It was during this period of time that Dunn sent postcards to friends in Michigan describing the good times she was having and stating she was going to marry Remeta.

On February 13, 1985, on I-135 north of Wichita, Remeta, Dunn, and Walter picked up a hitchhiker, James C. Hunter. Dunn testified that because she was sitting between Walter, who was driving, and Remeta, who occupied the front passenger seat, Hunter got into the back seat. At the I-70 Levant interchange, the group was stopped by a police car driven by Thomas County Undersheriff Benjamin F. Albright. Albright instructed the occupants to place their hands on the car ceiling. Dunn testified she did this. Dunn and Remeta both testified that Dunn tried to stop Remeta as he exited the vehicle with the .357. Remeta shot Albright twice. Immediately after Remeta returned to the car, Hunter accidentally shot Dunn in the hip with a .22 handgun

while attempting to shoot Remeta. Dunn began screaming that she was hurt and needed to be taken to a hospital. Albright later described the person who shot him as having shoulder-length brown hair and a beard—a description which matched Hunter.

After departing from the I-70 Levant interchange, Walter drove until the group arrived at the Bartlett Elevator in Levant, Kansas. At the elevator were eight individuals: Maurice Christie, the elevator manager; Fred Sager, the assistant manager; Dennis Tubbs; Raymond Haremza; Rick Schroeder; Glenn Moore; and two others. Schroeder and Moore were taken hostage and forced into a pickup truck. While phoning for the police, Christie was shot by Remeta. Remeta, Walter, Hunter, Dunn, and the two hostages proceeded in the pickup to a point north of Highway 24 near Colby, Kansas, where they stopped and Remeta shot both Schroeder and Moore with the .357, leaving their bodies by the side of the road.

Later, near a farmhouse in Rawlins County, police forced the fleeing pickup off the road. After a gun battle during which Walter was killed and Dunn and Remeta were wounded, Remeta, Hunter, and Dunn were arrested. All three were charged with two counts of felony murder (Schroeder and Moore), two counts of aggravated kidnapping (Schroeder and Moore), one count of aggravated battery on a law enforcement officer (Albright), one count of aggravated battery (Christie), and one count of aggravated robbery. Remeta pled guilty to all counts. Hunter and Dunn were tried by a jury.

During the trial, witnesses gave conflicting testimony regarding Dunn's participation in the events at the elevator:

STATE'S WITNESSES

Maurice Christie testified he saw a car parked between the scale house and the grain bins and that Dunn was sitting in the driver's seat. Dennis Tubbs testified that the driver of the pickup truck had shoulder length, light or dark blond hair and he heard a female voice saying: "Get in." Raymond Haremza described the driver of the pickup as having "long, shoulder length, dishwater blond hair." Wesley Moore described the driver of the pickup truck as having shoulder length dishwater blond hair. (Dunn's hair, which she had dyed while in Wichita, was shoulder length and blond; Mark Walter's hair was ear-lobe length and brown.) Judy McKee, who was driving along Highway 24, observed the

pickup and testified that the driver was Mark Walter and that the person sitting next to the driver (Dunn), was smiling and appeared to be having a good time. Kenneth Dibble, a reserve police officer, testified that the driver of the pickup had dark hair.

## DEFENSE WITNESSES

Robert Blecha, Special Agent for the Kansas Bureau of Investigation, who conducted the initial interviews of witnesses in the case, testified that, at that time, neither Haremza, Tubbs, nor Sager indicated Dunn was the driver of the pickup. When asked why Dunn remained with him from January 27 - February 13, Remeta testified, "[s]he didn't have no choice." He said he tricked Dunn into taking her father's gun, which he later used to threaten her. He admitted making threats against members of Dunn's family. He said that if Dunn had tried to leave him during the trip, he would have "kept his threats." Regarding the events on February 13, Remeta testified Walter was driving the car, while he occupied the passenger seat with Dunn between them. At the Bartlett Elevator, Remeta told Walter to put Dunn in the pickup. Walter then helped Dunn into the seat behind the driver's seat, and drove the pickup away from the elevator.

Hunter corroborated that he accidentally shot Dunn at the Levant intersection, and that Dunn sat between Walter and Remeta until they reached the Bartlett Elevator. At the elevator, Hunter put Dunn behind the driver's seat of the pickup. Later, when Remeta told Schroeder and Moore to get out of the pickup, Hunter suggested to Remeta, "Why don't you let that girl out here, just leave us here and take off in this truck." When Remeta asked Dunn if she wanted to get out, she answered: "No, I love you. I want to go with you."

Dunn testified that she was "herded" into the pickup on the driver's side and placed behind the jump seat. She denied that Remeta ever asked her if she wanted to be let out of the pickup. Dunn testified that her main concern from the time they reached the elevator until the time she was arrested was the fact that she had been shot. She denied ever driving the car or the pickup. She denied any involvement in the shootings and maintained she was unaware that Christie, Schroeder, and Moore had been shot. Dunn stated that she was afraid of Remeta even after they were apprehended, but admitted she had written love letters to him while in jail.

The jury found Dunn and Hunter guilty of all counts. Remeta, Hunter, and Dunn were sentenced to maximum consecutive terms of imprisonment. Hunter appealed and his conviction was reversed in *State v. Hunter*, 241 Kan. 629, 740 P.2d 559 (1987), on the ground that the trial judge refused to instruct the jury on his defense of compulsion. Dunn appeals her convictions and sentence raising numerous issues.

## DENIAL OF FUNDS FOR EXPERT EXAMINATION BY A PSYCHIATRIST

K.S.A. 1987 Supp. 22-4508 provides for authorization of funds for expert services if the judge determines that services are necessary and that the defendant is financially unable to obtain them. The authorization of supporting services in the criminal trial of an indigent defendant is a matter which lies within the sound discretion of the trial court, whose decision to deny services will not be disturbed unless the defendant shows prejudice to his substantial rights resulting from abuse in the exercise of the court's discretion. *State v. Haislip*, 237 Kan. 461, 484, 701 P.2d 909, *cert. denied* 474 U.S. 1022 (1985); *State v. Reynolds*, 230 Kan. 532, 534-35, 639 P.2d 461 (1982); *State v. Burnett*, 222 Kan. 162, 164-65, 563 P.2d 451 (1977); *State v. Frames*, 213 Kan. 113, 118, 515 P.2d 751 (1973).

Intending to defend on the basis that she was under the influence, duress, and emotional and mental restraint of Remeta, and was unable to adequately prepare her defense without the assistance of an expert in the field of forensic psychiatry, Dunn filed a motion requesting $1,800.00 to pay for the expert services. At the hearing on the motion, the only witness, the jail chaplain, testified that, after spending about 14 hours with Dunn, he believed her to be extremely impressionable, as well as capable of being easily affected and led by threats. He felt that Dunn had attempted to disassociate herself from events that occurred. In addition, Dunn's attorney stated that he had discussed the case with a psychiatrist from the Menninger Foundation, who advised him to investigate the battered wife syndrome and disassociative response. It was the attorney's intent "to offer these defenses to show absence of both the specific intent to commit the crimes charged and all criminal responsibility." He further stated, "[O]ur defense is not compulsion. Our defense is what we've

described here today, Your Honor. We were not compelled to complete crimes, we were compelled to be present."

Judge Willoughby, noting that Dunn had not raised the issues of competence or insanity, denied the request for funds because her defense to the charge of felony murder was neither viable nor recognized in Kansas. Twice more Dunn renewed the motion for expert services, which the court denied. Immediately prior to trial, the request for funds was again renewed, when Dunn's attorney stated that he had just received Remeta's prior prison record and that he now intended to present a defense based on the "hostage victim syndrome." The judge again denied the motion, finding that the evidence was not relevant.

K.S.A. 1987 Supp. 22-4508 is comparable to the federal provisions of 18 U.S.C. § 3006A (e) (Supp. IV 1986). K.S.A. 1987 Supp. 22-4508 allows an indigent defendant to make an *ex parte* application to the court for expert services necessary for an adequate defense. If the court, during the *ex parte* proceeding, finds that the services are necessary to provide an adequate defense, it authorizes counsel to obtain the services. The appointment of experts is not a constitutional requirement; rather, requests for such services are to be measured by the requirements of the due process test of fundamental fairness. *State v. Lee*, 221 Kan. 109, 113-114, 558 P.2d 1096 (1976).

Claiming that Kansas cases do not yield a consistent test for the court to determine when expert services are necessary, Dunn suggests that we adopt the test established by the United States Supreme Court in *Ake v. Oklahoma*, 470 U.S. 68, 84 L. Ed. 2d 53, 105 S. Ct. 1087 (1985). The *Ake* test for determining whether expert psychiatric services should be provided is a three-factor test balancing the private interest in the accuracy of criminal proceedings, the State's interest that will be affected if the psychiatric assistance is to be provided, and the probable value of the psychiatric assistance sought, and the risk of error in the proceedings if the evidence is not offered.

In *Ake*, the defendant met the test by communicating to the court his intent to rely on the insanity defense and his need of the evaluation of his sanity at the time the offense was committed. See *United States v. Sloan*, 776 F.2d 926 (10th Cir. 1985). What Dunn fails to grasp is that, before any balancing test is employed, she must first clearly show that her mental capacity is

a significant issue for a defense to the charges. This Dunn failed to do.

Having no desire to raise insanity as a defense, Dunn argued that because she was influenced by threats, was under duress, and was under the emotional and mental restraint of Remeta, she had no specific intent to commit the crimes, but was compelled by Remeta to be present when the crimes were committed. She claimed that to show that her acts were compelled by Remeta, the services of the expert witness were necessary to investigate the battered wife syndrome and the hostage or captivity syndrome. Dunn maintained that evidence of either or both syndromes would bolster her claim that she was acting under compulsion and, therefore, not criminally responsible.

Where self-defense has been asserted by a woman who has committed a crime against her batterer, expert evidence of the battered woman syndrome is admissible to prove the reasonableness of the defendant's belief that she was in imminent danger. *State v. Hodges*, 239 Kan. 63, 716 P.2d 563 (1986). The evidence is admitted in part to explain the woman's inability to leave her tormentor during the time of physical or psychological battering and also to illustrate the reasonableness of her fear of imminent danger. Here, however, Dunn attempted to intertwine the battered wife syndrome with the statutory defense of compulsion either to justify crimes committed against innocent third parties or to show that she was compelled to be at the crime scenes because of the earlier threats by Remeta against her and her family.

The defense of compulsion was successfully raised on appeal by Dunn's codefendant, Hunter, resulting in the reversal of his convictions.

K.S.A. 21-3209 provides:

"**Compulsion.** (1) A person is not guilty of a crime other than murder or voluntary manslaughter by reason of conduct which he performs under the compulsion or threat of the imminent infliction of death or great bodily harm, if he reasonably believes that death or great bodily harm will be inflicted upon him or upon his spouse, parent, child, brother or sister if he does not perform such conduct.

"(2) The defense provided by this section is not available to one who willfully or wantonly places himself in a situation in which it is probable that he will be subjected to compulsion or threat."

In *Hunter*, we held that the statutory prohibition on the use of

the compulsion defense is limited to crimes of intentional killing. Thus, where one is compelled to commit a felony and a death occurs, compulsion is a defense to the underlying felony. 241 Kan. at 642.

Although the compulsion defense is available in cases of felony murder, it is still a limited defense. In order to constitute the defense of compulsion, the coercion or duress must be present, imminent, and impending, and of such a nature as to induce a well-grounded apprehension of death or serious bodily injury if the act is not done. The doctrine of coercion or duress cannot be invoked as an excuse by one who had a reasonable opportunity to avoid doing the act without undue exposure to death or serious bodily harm. *State v. Milum*, 213 Kan. 581, 582, 516 P.2d 984 (1973). In addition, the compulsion must be continuous and there must be no reasonable opportunity to escape the compulsion without committing the crime. *State v. Myers*, 233 Kan. 611, 616, 664 P.2d 834 (1983).

It is important to compare Hunter's circumstances with Dunn's. Hunter was picked up hitchhiking along the interstate. Shortly after he entered the car, Remeta took out the .357 Magnum, fired it out the window, and began to talk about a hitchhiker he had killed. When Hunter asked to be let out of the car, Remeta refused. Remeta later fired the gun in the direction of Hunter and told Hunter he had killed a man for $40, as well as twelve other people. Remeta asked Hunter if Hunter thought a .357 Magnum could kill him. Between the time Hunter was picked up and the time that he was apprehended by police at the farmhouse, Remeta had possession of the .357 Magnum at all times. Remeta testified that he would have shot Hunter if Hunter had not followed orders. The total time Hunter spent with Remeta from the point where he was picked up by Remeta to the time he was apprehended by police was approximately two hours. Thus, Hunter could claim that he had no reasonable opportunity to escape and could argue that the jury should have been allowed to determine if he was compelled to commit the crimes.

Here, the time frame involving Dunn is far different. Dunn testified that Remeta's threats against her and her family commenced two and one-half weeks before the crimes in Kansas occurred. Dunn testified that the only significant threat against

her occurred on the way to Florida, when she told Remeta she might leave him, and he became angry, pulled the gun out, and placed it to her head.

According to Dunn's own testimony, this was the only time Remeta actually physically threatened her. After that, his threats consisted of intermittent reminders to Dunn of the prior intimidation. Dunn testified that the threats were not continuous, stating:

"Well, he still did treat me nice at times, but he'd always make sure that threat was known to me, that he'd be nice—you know, he could be nice to me if I was behaving. But if I didn't behave, you know, he wasn't going to be because, you know, like if I'd smart mouth him real bad or something, I might get a slap or whatever he felt like at the time. It depends on his mood. He's real moody."

Did Dunn have a reasonable opportunity to escape after she was threatened while traveling to Florida? The record shows that she did. There were numerous times Dunn could have left while Remeta slept. The day prior to the murders in Kansas, while Remeta and Walter both slept, Dunn watched television all afternoon. Later, when the three went out to a Kentucky Fried Chicken restaurant, Remeta sent Dunn to get the food. Two police officers were in the restaurant. Because Walter had driven the car up over the curb in front of the restaurant, the officers approached Dunn and asked her if she and the others had been drinking. Dunn answered no, and returned to the car. These were reasonable opportunities for Dunn to have eluded Remeta. Because the intimidation by Remeta was not continuous, and Dunn had ample opportunity to escape, she could not claim she was compelled to be present when the crimes were committed.

Dunn also argues that expert evidence on the hostage syndrome would have negated the criminal intent requirement for her conviction. The hostage or captivity syndrome is a well-established psychological theory used as an explanation of an accused's actions in criminal cases. Some courts have admitted evidence of this syndrome to negate criminal intent, most notably in *United States v. Hearst*, 412 F. Supp. 889 (N.D. Cal. 1976), where the federal district court held that testimony concerning the effects of kidnapping, prolonged incarceration, and psychological and physical abuse on the kidnap victim was relevant to the defendant's claim that she had been coerced by the kidnappers to commit the offenses charged. However, that case focused on the defendant's mental state as a kidnap victim

and her alleged subsequent brainwashing—factors not present in this case.

The hostage syndrome was recently discussed in *U.S. v. Kozminski*, 821 F.2d 1186, 1194 (6th Cir. 1987), where the court stated that the hostage syndrome requires ten necessary elements, which are: (1) prolonged captivity; (2) continuous round-the-clock supervision, such as guarding; (3) an isolated environment; (4) removal of all psychological supports; (5) an attack on the victim's personality; (6) a lack of privacy; (7) an assault upon the total personality; (8) a systematic use of reward and punishment; (9) a tearing of the fabric of the personality; and (10) the building up of a new personality.

In *Kozminski*, victimized farm workers who claimed they were held in involuntary servitude attempted to introduce expert testimony on the captivity syndrome. The court noted the above list of conditions describes events such as the brainwashing techniques employed by the Chinese on prisoners of war during the Korean conflict. The court stated: "As bad as conditions on the Kozminskis' dairy farm are alleged to be, they fall short of those found in a Chinese prison camp." 821 F.2d at 1194. The court then held that, as a matter of law, the captivity syndrome was not applicable to that case because there was no evidence of actual captivity.

Similarly here, the facts do not support Dunn's claim that she was a captive. She was not kidnapped; she went with Remeta voluntarily after stealing a gun for him. She was not guarded round-the-clock. In fact, there were many times when she was alone, or awake while Remeta was asleep. She was not isolated, but stayed with friends in Florida, went to Disney World, and stayed in a number of motels and hotels during the crime spree. She was not subject to brainwashing. The fact that Remeta chose her clothes, called her his wife, and sold some of her jewelry certainly does not approach the total breakdown of personality which occurs when captors attempt to brainwash their captives. It is apparent that Dunn's romantic attachment to Remeta was voluntary. If she was a victim, she was a victim of her own poor judgment.

Even though the trial judge was incorrect in ruling that compulsion was not a defense to felony murder, he was correct in ruling that expert testimony on the battered woman syndrome

and the hostage syndrome was not relevant to the facts of this case when he denied Dunn's request for funds to obtain an expert witness. On appeal, the defendant has the burden of furnishing a record which affirmatively shows that prejudicial error occurred when a trial court denies a defendant's request for expert services pursuant to K.S.A. 1987 Supp. 22-4508. Further, we have adopted the federal rule that reversal is indicated only where a defendant has established prejudice by clear and convincing evidence. *State v. Lee,* 221 Kan. at 114-15. Dunn has failed in her effort to meet this standard.

CHANGE OF VENUE

In *Hunter,* we held that the trial court did not err in refusing to grant a change of venue and that decision is dispositive here. However, a few comments are necessary.

Dunn contends that, because Thomas County was "not capable of producing a fair and impartial jury," the trial court made several errors by denying her motion for change of venue. K.S.A. 22-2616(1) provides:

"In any prosecution, the court upon motion of the defendant shall order that the case be transferred as to him to another county or district if the court is satisfied that there exists in the county where the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial in that county."

Defendant points to the same factors which were alleged to be prejudicial in *Hunter* (media publicity, death threats, affidavits from 14 members of the community stating that defendants could not get a fair trial, a large number of signatures from Thomas County on a petition favoring the death penalty, and the fact that some of the jurors were acquainted with the victims), but places particular emphasis upon the extensive media publicity, jury selection, and trial environment.

EXTENSIVE PRETRIAL MEDIA COVERAGE OF THE CRIME

Extensive pretrial media coverage of a crime alone has never established prejudice per se. *State v. Ruebke,* 240 Kan. 493, 500, 731 P.2d 842 (1987); *State v. Porter,* 223 Kan. 114, 117, 574 P.2d 187 (1977). It is the defendant's burden to show that the publicity has reached the community to such a degree that it is impossible to get an impartial jury. *State v. May,* 227 Kan. 393, 394-95, 607 P.2d 72 (1980). There is no question that the crimes committed shocked the surrounding communities, and that the local media

reflected this outrage. These facts alone, however, do not entitle defendant to a change of venue. See *State v. Myrick & Nelms*, 228 Kan. 406, 417, 616 P.2d 1066 (1980). The news reports were factual and not inflammatory, and Dunn has not presented any evidence which shows the media attempted to influence the outcome of the trial. See *State v. Sanders*, 223 Kan. 273, 279, 574 P.2d 559 (1977).

Several articles in the Colby Free Press described Dunn favorably as a former honor student with no prior criminal record, who came from a respected family. The paper also publicized Dunn's defense, specifically her claim that she was under threat the entire time she was with Remeta, and that she never had possession of a gun.

## TRIAL JUDGE'S FAILURE TO CONTROL THE PRETRIAL AND TRIAL ENVIRONMENT

Dunn also complains that the trial judge violated her due process rights by not protecting her from publicity surrounding the trial. Defendant compares this case with *Sheppard v. Maxwell*, 384 U.S. 333, 16 L. Ed 2d 600, 86 S. Ct. 1507 (1966). In *Sheppard*, the United States Supreme Court reversed defendant's conviction for second-degree murder due to the trial judge's failure to control media publicity. Sheppard was an unusual case where a near-carnival atmosphere permeated the courtroom.

During the nine-week *Sheppard* trial, reporters sat at a press table inside the bar, a few feet from the jury box. Members of the press filled the courtroom and handled and photographed trial exhibits. Radio broadcasts were done next to the jury room. Private courtroom proceedings were reported by the press. In addition, before trial, the names and addresses of the jurors were published, and they received letters and phone calls concerning the case. The press was allowed to interview prospective witnesses and often disclosed their proposed testimony. The trial judge made no effort to control the release of leads, information, and gossip to the press by the prosecuting attorneys, the coroner, the police officers, or the witnesses.

The atmosphere at Dunn's trial does not even begin to approach what occurred in *Sheppard*. Although the trial was broadcast locally and one of the stations had hired a legal expert to comment on the trial, the judge carefully admonished the jury not to watch television. In addition, the jury was told not to read

the newspapers nor to discuss the case with anyone. The jurors were informed to only consider facts admitted into evidence and to determine the defendant's guilt based on the evidence admitted and the judge's instructions. The judge explained that if the jurors followed his admonitions and instructions, the defendant would obtain a fair trial.

Here, the trial judge did not fail to control the pretrial and trial environment and the jury was properly instructed to avoid being tainted by publicity during the trial.

JURY SELECTION

Defendant cites *Rideau v. Louisiana*, 373 U.S. 723, 10 L. Ed. 2d 663, 83 S. Ct. 1417 (1963) and *Irvin v. Dowd*, 366 U.S. 717, 6 L. Ed. 2d 751, 81 S. Ct. 1639 (1961), for the proposition that a court should give little weight to a juror's expression of impartiality when the voir dire reflects a pattern of deep and bitter prejudice within the community. Dunn fails to note that, in *Dowd*, eight of the jurors stated that they had already formed an opinion that the defendant was guilty and one stated that he could not give the defendant the benefit of the doubt that he was innocent. In *Rideau*, the Court held that it was a denial of due process for a state court to deny a change of venue where an interview in jail between the defendant and the sheriff consisting of admissions by defendant was broadcast three times over a local television station and heard by a substantial number of people in the community. Here, the interview which was televised was with Remeta, not Dunn, and Remeta's comments regarding Dunn's conduct were exculpatory.

As stated in *Hunter*:

"When crimes occur in rural areas, it is inevitable that members of the jury panel will be acquainted with trial participants or victims. In such cases we must examine the jury selection process to determine whether defendant's rights to a fair trial have been jeopardized. As we have stated, the difficulty in selecting a fair and impartial jury is an important factor in weighing a claim of prejudice. *State v. Ruebke*, 240 Kan. at 500; *State v. Myrick & Nelms*, 228 Kan. at 418. In this case, a jury panel was passed for cause after one and one-half days of voir dire. From a panel of 143 prospective jurors, 39 were excused for cause, 51 were dismissed by peremptory challenges, and 39 were excused from service; twelve jurors and two alternates served. There appears to have been no difficulty in selecting an impartial jury. Although five of the final twelve jurors stated they were acquainted with one or more of the victims, none admitted to a close friendship and each stated under oath that he or she would be able to remain fair and impartial. In order to find that defendant has established prejudice, we

would have to assume that these jurors violated their oaths; this we cannot do." 241 Kan. at 636.

Dunn has failed to establish that there existed such prejudice in Thomas County that she reasonably could not have received a fair trial. The trial court did not abuse its discretion in denying defendant's motion for change of venue.

## ADMISSION OF REMETA'S LETTER

Dunn contends the trial court erred by refusing to admit a letter written to her by Remeta while they were both in jail. In the letter, Remeta referred to Dunn as a "slave girl" whom he intended to hold for ransom. When Remeta testified during Dunn's trial, he stated that the letter was in his handwriting and that he remembered what he wrote. He stated that the term "slave" referred to Dunn. On examination by the State, Remeta stated he did not remember exactly when he wrote the letter and refused to divulge to whom the letter was sent. The trial judge then refused to admit the letter.

Generally, a writing may be authenticated by establishing the genuineness of the writer's signature or identity of the handwriting, or by indirect or circumstantial evidence without resort to proof of handwriting. K.S.A. 60-464, *State v. Milum*, 202 Kan. 196, 447 P.2d 801 (1968). Here, even if erroneous, the exclusion of the letter was harmless. Dunn offered the letter to bolster her claim that she was a hostage. However, the facts of this case did not support the existence of the hostage syndrome. In addition, Remeta testified as to the contents of the letter.

## DENIAL OF CONTINUANCE

Dunn was arraigned on March 28, 1985, and trial was set for June 4, 1985. On May 13, 1985, Dunn requested a continuance for three reasons: (1) to obtain a report from Texas authorities which would show that Dunn had attempted to prevent a crime there; (2) to obtain a statement from an inmate at Lansing who might have information regarding Remeta's threats against Dunn; and (3) to secure funds for expert psychiatric services.

In the trial of a criminal charge, the matter of a continuance is within the discretion of the trial court and its ruling will not be disturbed unless such discretion has been abused and the substantial rights of the defendant have been prejudiced. *State v. Jones*, 226 Kan. 503, 509, 601 P.2d 1135 (1979). Dunn notes that the trial judge, when denying her request for the continuance,

commented that the victims and the families of the victims deserved consideration. While Dunn may be correct in stating that the judge should have focused on the her rights, rather than the victims' rights, she has failed to show any prejudice by the denial of the continuance. Dunn's claim that she was prejudiced because the ruling prevented her from obtaining evidence to support her defense of compulsion is without merit, since she was not entitled to raise that defense. Further, Dunn did acquire an order for the release of the prisoner at Lansing, but the prisoner was not called to testify at trial. Regarding the information from Texas, one month was not shown to be insufficient time to obtain the Texas report. The trial court did not err in refusing the motion for a continuance.

## SEQUESTRATION OF WITNESSES

Dunn next argues that the trial court erred in refusing her request to sequester four witnesses (Fred Sager, Raymond Haremza, Maurice Christie, and Wesley Moore) during the testimony of the events at the Bartlett grain elevator. When requested by a defendant, K.S.A. 22-2903 requires the sequestration of witnesses during preliminary hearings. At trial, sequestration is not a right, but is committed to the sound discretion of the trial court and, in the absence of any showing of prejudice to the defendant, the trial court's decision will not be reversed on appeal. *State v. Freeman*, 223 Kan. 362, 373, 574 P.2d 950 (1978).

Because the only evidence of any direct participation by Dunn in the crimes came from these four witnesses, she contends the trial court's refusal to sequester the witnesses caused severe prejudice. At trial, each witness testified that he observed a person with shoulder-length blond hair (Dunn) driving the pickup truck at the elevator. Dunn argues that, when each gave his statement to the KBI agent shortly after the crime, not one of the witnesses included this description in his statement.

After the four witnesses had testified, the defense called the KBI agent who had taken the initial statements of the four witnesses. The agent was thoroughly examined about the discrepancies between the four witnesses' initial statements and their testimony at trial. The KBI agent admitted that witnesses may become vindictive, but stated it is not unusual for witnesses to remember additional details after the passage of time. He

testified it is normal procedure for law enforcement officers to have an initial interview and to follow that interview with another a few days later. Because he was assigned to another case, he did not conduct a second interview of the witnesses.

The jury had the opportunity to judge the credibility of the four witnesses and their attempted impeachment by the defense. In addition, prior to the trial, one of the witnesses, Moore, gave the same description of the driver at the preliminary examination. The trial judge's decision not to sequester the witnesses was not an abuse of discretion, and did not prejudice defendant's right to a fair trial.

## SUFFICIENCY OF THE EVIDENCE

Defendant contends that the evidence introduced against her at trial was insufficient to convince a rational trier of fact beyond a reasonable doubt that she was guilty of aiding and abetting in the commission of the crimes. K.S.A. 21-3205(1) provides a person is criminally responsible for a crime committed by another if he intentionally aids, abets, advises, hires, counsels, or procures the other to commit the crime. Mere association with the principals who actually commit the crime or mere presence in the vicinity of the crime are themselves insufficient to establish guilt as an aider and abettor; however, when a person knowingly associates himself with the unlawful venture and participates in a way which indicates he willfully is furthering the success of the venture, such evidence of guilt is sufficient to go to the jury. See *State v. Williams*, 229 Kan. 646, 661, 630 P.2d 694 (1981); *State v. Payton*, 229 Kan. 106, 111, 622 P.2d 651 (1981); *State v. McDaniel & Owens*, 228 Kan. 172, 178, 612 P.2d 1231 (1980); *State v. Wilson & Wentworth*, 221 Kan. 359, 367, 559 P.2d 374 (1977); *State v. Edwards*, 209 Kan. 681, 686, 498 P.2d 48 (1972).

In a criminal action, when the defendant challenges the sufficiency of the evidence to support a conviction, the standard of review on appeal is whether the evidence, viewed in the light most favorable to the prosecution, convinces the appellate court that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. The appellate court looks only to the evidence in favor of the verdict to determine if the essential elements of the charge are sustained. *State v. Ramos*, 240 Kan. 485, 486-87, 731 P.2d 837 (1987), *State v. Douglas*, 230 Kan. 744, 745-46, 640 P.2d 1259 (1982).

Here, there was sufficient evidence for the jury to find that Dunn was driving the truck, and this would have been sufficient to sustain her conviction as a *principal*. Even without evidence that she was the driver, one who stays with a vehicle in which he or she knows that the main participants in the crime plan to make their getaway intentionally aids and abets in the commission of the crime and can be charged and convicted of the crime, although he or she did not participate at the scene of the crime. *State v. Burton*, 235 Kan. 472, Syl. ¶ 5, 681 P.2d 646 (1984). A review of the evidence introduced at trial substantiates a verdict of guilty.

## FAILURE TO INSTRUCT ON COMPULSION

Dunn argues that, because whatever acts she may have committed were the results of threats against her and her family by Remeta, the trial court erred by refusing to instruct the jury on the defense of compulsion. We disagree. Here, the trial court's rationale for refusing to instruct—the belief that the defense of compulsion was not available in cases of felony murder—was incorrect.

However, in *State v. Hunter*, 241 Kan. 629, 740 P.2d 559 (1987), we pointed out that the statutory limitation on the use of the compulsion defense is restricted to crimes of intentional killing. We held that where compulsion is a defense to an underlying felony under K.S.A. 21-3209, so that the felony is justifiable, compulsion is equally a defense to a charge of felony murder. 241 Kan. at 642.

We have previously determined the defense of compulsion was not available to Dunn. Therefore, the trial court did not err in refusing the compulsion instruction. We have long held that the judgment of a trial court, if correct, should be upheld, even though the court may have relied upon a wrong ground or assigned an erroneous reason for its decision. *State v. Littlejohn*, 236 Kan. 497, 694 P.2d 403 (1984).

## CONSTITUTIONALITY OF CONVICTION OF AIDING AND ABETTING FELONY MURDER

Dunn contends that her conviction of aiding and abetting felony murder violates the due process guarantees of the Fourteenth Amendment of the United States Constitution. She argues that it is "fundamentally unfair" for a person who aids and abets

a forcible felony to be responsible for a murder committed in perpetration of the felony and that where an aider and abettor does not know the activity involved constitutes a crime the requisite intent for felony murder does not exist. Defendant cites *State v. Thomas*, 239 Kan. 457, 720 P.2d 1059 (1986), where we stated the following:

"A principal in a crime must be actually or constructively present, aiding and abetting the commission of the offense. It is not necessary that one do some act at the time in order to constitute him a principal, but he must encourage its commission by acts or gestures, either before or at the time of the commission of the offense, with full knowledge of the intent of the persons who commit the offense. He must do some act that is in furtherance of the offense.

"An aider or abettor is one who advises, counsels, procures, or encourages another to commit a crime. A person is an aider and abettor if he or she actively assists in planning and preparing for the perpetration of a crime and assumes a station with the knowledge of the perpetrators where he or she may be able to assist either in the commission of the crime or in the escape immediately following the perpetration of the crime. An aider and abettor need not know that the activity constitutes a crime. It is enough that he or she knows facts that are essential to constitute the activity as a crime. See generally *State v. Schriner*, 215 Kan. 86, 523 P.2d 703 (1974)." 239 Kan. at 461.

In the complaint, the State charged Dunn as a principal. The jury was instructed under PIK Crim. 2d 54.05, which states:

"A person who, either before or during its commission, intentionally (aids) (abets) (advises) (hires) (counsels) (procures) another to commit a crime with intent to promote or assist in its commission is criminally responsible for the crime committed regardless of the extent of the defendant's participation, if any, in the actual commission of the crime."

A person is criminally responsible for the crimes of others if that person intentionally aids and abets the others in the commission of the crime. K.S.A. 21-3205. The element of intent necessary in aiding and abetting may be inferred from circumstantial evidence. *State v. Goering*, 225 Kan. 755, 758, 594 P.2d 194 (1979). Here, Dunn was present at the crime scene and there was evidence that she acted in furtherance of the offense. The jury concluded that Dunn was a knowing participant in the crimes of aggravated robbery and/or aggravated kidnapping. This felonious intent is sufficient for conviction of felony murder.

## CONSTITUTIONALITY FOR CONVICTIONS OF FELONY MURDER AND THE UNDERLYING FELONIES

Dunn contends that her convictions for felony murder, aggravated kidnapping, and aggravated robbery violate the double

jeopardy clause of the Fifth Amendment to the United States Constitution, § 10 of the Bill of Rights of the Kansas Constitution, and K.S.A. 1987 Supp. 21-3107. She reasons that the aggravated robbery and kidnapping charges are lesser included offenses of felony murder and that convictions for both murder and the underlying felonies constitute multiple punishment for the same offense.

The constitutional prohibition against double jeopardy is directed to the identity of the offense and the act. Where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied when determining whether there are two offenses or only a single offense is whether each statutory provision requires proof of an element that the other does not. Where one statute provides proof of an element that the other does not, the crimes are not the same, even though proof of the separate crimes may substantially overlap.

K.S.A. 1987 Supp. 21-3107 provides:

"(1) When the same conduct of a defendant may establish the commission of more than one crime under the laws of this state, the defendant may be prosecuted for each of such crimes. Each of such crimes may be alleged as a separate count in a single complaint, information or indictment.

"(2) Upon prosecution for a crime, the defendant may be convicted of either the crime charged or an included crime, but not both. An included crime may be any of the following:

"(a) A lesser degree of the same crime;

"(b) an attempt to commit the crime charged;

"(c) an attempt to commit a lesser degree of the crime charged; or

"(d) a crime necessarily proved if the crime charged were proved."

Dunn's contention that the aggravated robbery charge merges into the homicide charge is unfounded. Murder in the first degree is the killing of a human being committed maliciously, willfully, deliberately, and with premeditation or *committed in the perpetration or attempt to perpetrate any felony*. K.S.A. 21-3401. The underlying felony of robbery is the taking of property from the person or presence of another by threat of bodily harm to his person or the person of another or by force, K.S.A. 21-3426, and becomes aggravated robbery where the robbery is committed by a person who is armed with a dangerous weapon or who inflicts bodily harm upon any person in the course of such robbery. K.S.A. 21-3427.

We have held that the proper test for determining whether an

underlying felony merges into a homicide is whether all the elements of the felony are present in the homicide and whether the felony is a lesser included offense of the homicide. If this is not true, then the felony must be a separate and distinct offense and the doctrine of merger does not apply. *State v. Rueckert*, 221 Kan. 727, 733, 561 P.2d 850 (1977). A more correct formulation of the proper test when considering merger is whether the elements of the underlying felony are so distinct from the homicide so as not to be an ingredient of the homicide. *State v. Lashley*, 233 Kan. 620, 631, 664 P.2d 1358 (1983). While the force used to commit robbery is an integral part of aggravated robbery, it is not the entire body of that offense. The essence of aggravated robbery is to deprive a person of property, which is not an element of homicide. Aggravated robbery and homicide do not merge. *State v. Rueckert*, 221 Kan. at 733.

The same principles apply to the offense of aggravated kidnapping as the underlying felony. K.S.A. 21-3420 defines kidnapping as the taking or confining of any person accomplished by force, threat, or deception, with the intent to hold such person (a) for ransom, or as a shield or hostage; or (b) to facilitate flight or the commission of any crime; or (c) to inflict bodily injury or to terrorize the victim or another; or (d) to interfere with the performance of any governmental or political function. K.S.A. 21-3421 provides that aggravated kidnapping is kidnapping as defined in K.S.A. 21-3420 when bodily harm is inflicted upon the person kidnapped. If there is evidence to support the elements of kidnapping and evidence to support that a homicide was committed during the perpetration of the kidnapping, then the offenses would not merge. Both of the felony convictions here are convictions for crimes independent of the homicides; therefore, they do not merge.

Dunn's convictions of aggravated robbery, aggravated kidnapping, and felony murder require the State to prove an element in each offense that is not required in the other offenses. Dunn's multiple convictions for the single act or transaction are constitutionally permissible.

SENTENCING

Dunn was sentenced to two life terms for the felony-murder convictions, two life terms for the aggravated kidnapping convictions, 15 years to life for aggravated battery of a law enforce-

ment officer, 15 years to life for aggravated robbery, and 5-20 years for aggravated battery, all terms to run consecutively. Hunter and Remeta each received the same sentence. Dunn's motion to modify the sentence as excessive under the facts was denied by the sentencing judge.

A sentence imposed by a trial court will not be disturbed on the ground it is excessive, provided it is within the limits set by law and within the realm of discretion on the part of the trial court, and the sentence is not the result of partiality, prejudice, oppression, or corrupt motive. *State v. Richard*, 235 Kan. 355, 366, 681 P.2d 612 (1984). Dunn argues that the sentencing judge was partial when he disregarded all of the testimony that favored imposition of a lenient sentence and relied on misleading and inaccurate information, particularly witness McKee's testimony that she saw defendant laughing in the truck after the hostages were taken. Actually, the judge's comments relating to McKee's testimony were made at the hearing on modification for sentencing.

When sentencing Dunn, the judge commented that the fact that she was sorry did not undo the harm caused by the criminal acts. He found that Dunn had numerous opportunities to disassociate herself from Remeta prior to the crimes committed in Kansas, but instead chose to stay with Remeta and willingly participate in the taking of human lives. The judge then imposed the sentence. We have reviewed the record and find that the sentence was not the result of partiality, prejudice, oppression, or corrupt motive.

Defendant also contends that the court erred in sentencing Dunn to the same terms as Hunter and Remeta, citing *State v. Goering*, 225 Kan. 755. In *Goering*, this court held it was error to sentence the defendant, who aided and abetted in the commission of the crimes, to consecutive terms, when one of her codefendants, the principal, was given concurrent sentences. The court noted that Goering was the least culpable of the defendants involved. Here, there was no disparity in sentencing. While the judge did not expressly review each of the factors set forth in K.S.A. 21-4606, he did state that he had considered them and found many inapplicable. He then stated he placed great emphasis on the harm caused by the crimes and the lack of excuse or justification. The sentence imposed upon Dunn is within the statutory limits and no abuse of discretion has been shown.

## MOTION FOR A NEW TRIAL

The final issues raised by Dunn relate to the trial court's denial of her motion for a new trial. Subsequent to the docketing of her appeal, the case was remanded to the district court to hear Dunn's motion for a new trial based on (1) newly discovered evidence, and (2) the State's failure to reveal exculpatory evidence. The motion was set to be heard on April 30, 1987.

The attorney appointed to represent Dunn for her appeal attempted to issue subpoenas to both prosecuting attorneys, several KBI agents, and the attorney that had been appointed to represent her in the trial. Dunn requested to be present at the hearing, filed a motion for the production of a witness from Florida, and also planned to call a psychologist from the Menninger Foundation to testify. After a telephone conference requesting a continuance, the judge issued a prehearing order on April 17, 1987, which informed Dunn that prior to having the witnesses testify, she must submit an affidavit of the relevant testimony of the witnesses, including any evidence that the defendant did not commit the crime. The judge stated he would not reconsider his exclusion of evidence of the battered wife syndrome and the hostage syndrome or his denial of the instruction on compulsion. In addition, he found Dunn's presence at the hearing unnecessary.

## ILLEGAL PREHEARING ORDER

Dunn claims that the prehearing order was "illegal," since it prohibited her from presenting evidence at the hearing on the motion for a new trial in violation of her due process rights and her Sixth Amendment right to confrontation of witnesses.

Dunn based the motion for a new trial on newly discovered evidence. Part of this "new evidence" was a post-conviction evaluation by a psychologist at the Menninger Foundation, Dr. Marilyn Hutchinson. At the hearing, the psychologist's report was admitted into evidence and considered by the judge. In addition, defendant's counsel explained at length the methodology employed by the expert to establish a theory of "learned helplessness" and its relevance to the battered woman syndrome. Although the psychologist was not allowed to testify in person, sufficient evidence was presented for the judge to rule on whether this evidence was "newly discovered."

Defendant also argued that the State had failed to turn over "exculpatory evidence" prior to trial. This evidence consisted of police reports from other states concerning the crimes committed by Remeta on the way to Kansas. Defendant maintained this evidence would show that she was merely a passive observer to the crimes. Although the prosecutors and KBI agents did not testify, the judge was able to determine from their reports that the evidence was not exculpatory.

As to the presence of Dunn, we have ruled that the presence of the defendant at a hearing on post-trial motions is not a matter of right, but a matter within the discretion of the trial court. *State v. Bryant*, 227 Kan. 385, 607 P.2d 66 (1980). Dunn also argues that her presence and that of her trial attorney, Brooks, was necessary for a determination of the issue of ineffective assistance of counsel. An examination of the trial record reveals that the judge's order not to require the presence of Dunn or her trial attorney did not prejudice defendant's ability to present evidence at the hearing on the motion for a new trial.

The Sixth Amendment right to compulsory process guarantees the accused the right to obtain witnesses for his defense at the trial. The hearing on a motion for a new trial is not a trial and the judge did not deny Dunn the right to present evidence at the hearing for a new trial, but merely limited the form of the presentation of evidence to affidavits and summation by counsel. A motion for new trial based on newly discovered evidence, filed after the imposition of sentence, is comparable to the procedure provided in K.S.A. 60-1507. In proceedings under 60-1507, the trial court normally conducts a preliminary inquiry to determine whether the claims asserted in the motion are substantial before granting a full evidentiary hearing and requiring the petitioner to be present. *State v. Bryant*, 227 Kan. at 390-91. Here, prior to requiring the witnesses to appear at the hearing, the judge properly determined there was no substantial basis for Dunn's claims.

RECUSAL OF JUDGE WILLOUGHBY

Defendant filed an initial motion for recusal pursuant to K.S.A. 1987 Supp. 20-311d(a), claiming that the judge could not afford her a fair trial. After Judge Willoughby refused recusal, defendant filed an affidavit pursuant to K.S.A. 1987 Supp. 20-311d(b), alleging bias because the judge ruled on the new trial motion

prior to the hearing. The matter was assigned to Hon. Jack Burr, who found the motion and affidavit legally insufficient to indicate bias or prejudice. Defendant now contends that Judge Burr erred in concluding that the affidavit was insufficient.

K.S.A. 1987 Supp. 20-311d(c)(5) provides grounds which may be alleged to support a change of judge:

"The party or the party's attorney filing the affidavit has cause to believe and does believe that on account of the personal bias, prejudice or interest of the judge such party cannot obtain a fair and impartial trial or fair and impartial enforcement of postjudgment remedies. Such affidavit shall state the facts and the reasons for the belief that bias, prejudice or an interest exists."

K.S.A. 1987 Supp. 20-311d(d) provides:

"In any affidavit filed pursuant to this section, the recital of previous rulings or decisions by the judge on legal issues or concerning the legal sufficiency of any prior affidavits filed by counsel for a party in any judicial proceeding, or filed by such counsel's law firm, pursuant to this section, shall not be deemed legally sufficient for any belief that bias or prejudice exists."

Judge Burr ruled that defendant's affidavit referred to previous adverse rulings by the trial judge and denied defendant's motion. This ruling was correct. We have long held that previous rulings of a trial judge are subject to correction on appeal and may not form a basis for recusal. *State ex rel. Miller v. Richardson*, 229 Kan. 234, 238, 623 P.2d 1317 (1981).

## ERROR IN DENIAL OF MOTION FOR NEW TRIAL

Defendant contends that the trial court erred in denying the motion for a new trial based on newly discovered evidence and the failure of the State to disclose exculpatory evidence. K.S.A. 22-3501(1) permits a district court to order a new trial on the grounds of newly discovered evidence.

The granting of a new trial on the basis of newly discovered evidence is within the trial court's discretion. A new trial should not be granted on the ground of newly discovered evidence unless the evidence is of such materiality that it will likely produce a different result upon retrial. The credibility of the evidence offered in support of the motion is for the trial court's consideration. The defendant has the burden of proof to show the alleged newly discovered evidence could not have been produced at trial with reasonable diligence. Appellate review of an order denying a new trial is limited to determining whether the trial court abused its discretion. See *State v. Johnson*, 222 Kan. 465, 471, 565 P.2d 993 (1977).

An examination of the record reveals that defendant's claim of newly discovered evidence has no merit. The "new" evidence consisted of a detailed report of the alleged rape of Dunn by two men in Florida in 1984. The defense knew of the rape prior to trial. In fact, Dunn testified at trial that the reason she wanted to take a gun along with her on the trip to Florida with Remeta and Walter was because she had been raped. Defendant has failed to carry the burden of showing that the police report could not have been obtained by due diligence.

Defendant also claims as newly discovered evidence a report by a psychologist, Dr. Hutchinson, from the Menninger Foundation. In the report, the psychologist stated that Dunn suffered from something akin to the battered woman or hostage syndrome, which explained her inability to escape from Remeta. (Hutchinson laid significant weight on the rape which, as the trial judge noted, was merely alleged and not proved.) Even if the report could be considered newly discovered evidence, it would not have produced a different result at trial, given the ruling that (1) evidence of the battered woman syndrome or the hostage syndrome was inadmissible to negate criminal intent in this case and (2) the facts in this case did not support a defense of compulsion.

Defendant also contends that a new trial was warranted because the State withheld exculpatory evidence. This evidence involved police reports from Michigan, Florida, Texas, and Arkansas which defendant contends showed that Dunn was not an active participant in Remeta's crimes in these other states and would have bolstered her claim of passive participation in the crimes in question. In *State v. Carmichael*, 240 Kan. 149, 727 P.2d 918 (1986), we stated:

"A defendant has a constitutionally protected privilege to request and obtain from the prosecution evidence that is material to the guilt or innocence of the defendant. Suppression of such evidence is a violation of the defendant's Fourteenth Amendment due process rights. *Brady v. Maryland*, 373 U.S. 83, 87, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963). Prosecutors are under a positive duty, independent of court order, to disclose exculpatory evidence to a defendant. To justify a reversal of a conviction for failure to disclose evidence, the evidence withheld by the prosecution must be clearly exculpatory and the withholding of the evidence must be clearly prejudicial to the defendant.

"There are three classifications regarding suppression of evidence: (1) where there is a deliberate bad faith suppression for the purpose of obstructing the defense or intentional failure to disclose evidence which has high probative

value and which could not have escaped the prosecutor's attention; (2) where there is a deliberate refusal to honor a request for evidence where evidence is material to guilt or punishment, irrespective of the prosecutor's good or bad faith in refusing the request; and (3) where suppression was not deliberate and no request for evidence was made, but where hindsight discloses that the defense could have put the evidence to significant use. *State v. Kelly*, 216 Kan. 31, 34, 531 P.2d 60 (1975)." 240 Kan. at 152.

Evidence is exculpatory if it tends to disprove a fact in issue which is material to guilt. The question becomes whether the defendant was materially prejudiced by the unavailability of the evidence. There are at least three different standards for determining materiality: (1) evidence which may be merely helpful to the defense; (2) evidence which raises a reasonable doubt as to defendant's guilt; and (3) evidence which is of such a character as to create a substantial likelihood of reversal. *State v. Carmichael*, 240 Kan. at 153 (citing Comment, *Materiality and Defense Requests: Aids in Defining the Prosecutor's Duty of Disclosure*, 59 Iowa L. Rev. 433, 445 [1973]).

The proper standard of materiality must reflect the court's overriding concern with the justice of a finding of guilt. We permit such a finding only if it is supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omission of the alleged exculpatory evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the record. 240 Kan. at 153 (citing *United States v. Agurs*, 427 U.S. 97, 112, 49 L. Ed. 2d 342, 96 S. Ct. 2392 [1976]).

Here, the trial judge implicitly determined that the evidence of crimes in other states was not exculpatory, and that defendant was not materially prejudiced by the unavailability of the evidence because the evidence would not have created a reasonable doubt as to defendant's guilt. He was influenced in this decision by the fact that, prior to trial, defense counsel by a motion in limine prohibited the State from presenting evidence of crimes committed in other states. This was a valid choice of trial strategy. Even if it were not, it has long been the rule that a party may not invite error and then complain of that error on appeal. *State v. Salton*, 238 Kan. 835, 715 P.2d 412 (1986). The trial court did not err in denying defendant's motion for a new trial.

Finally, defendant argues, in the alternative, that defense counsel's failure to obtain clearly exculpatory reports constituted ineffective assistance of counsel. Defendant states: "Evidence that she did not participate in other crimes or was merely passively present, corroborated her compulsion defense." As stated previously, defendant was not entitled to claim the defense of compulsion. Neither can it be said that defense counsel's strategy to file a motion in limine regarding the prior crimes constituted ineffective assistance of counsel. Dunn's claim that she would have been assisted in her defense by a recitation of the facts of numerous brutal crimes which occurred while she was sitting in the getaway car is not persuasive.

The standard for determining ineffective assistance of counsel, stated by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984), was followed by this court in *Chamberlain v. State*, 236 Kan. 650, 694 P.2d 468 (1985). *Chamberlain* requires that the defendant show that (1) counsel's performance was unreasonably deficient and (2) the deficient performance prejudiced the defendant so as to deprive him of a fair trial. Judicial scrutiny of counsel's performance must be highly deferential, and a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. A reviewing court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. 236 Kan. at 654.

With regard to the required showing of prejudice, the proper standard requires the defendant to show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. A court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. 236 Kan. 650, Syl. ¶ 3. Defendant has not shown that counsel's failure to obtain evidence of Dunn's participation in crimes in other states undermines confidence in the verdict.

Affirmed.