(770 P.2d 852)

No. 62,093

STATE OF KANSAS, *Appellee*, v. CLIFFORD H. BLOUNT, JR., *Appellant*.

Petition for review denied June 6, 1989.

Opinion filed March 24, 1989.

*Shannon S. Crane*, assistant appellate defender, and *Jessica R. Kunen*, chief appellate defender, for appellant.

*Sue Carpenter* and *David Debenham*, assistant district attorneys, *Gene M. Olander*, district attorney, and *Robert T. Stephan*, attorney general, for appellee.

Before ABBOTT, C.J., BRAZIL, J., and HARRY G. MILLER, District Judge Retired, assigned.

BRAZIL, J.: Clifford H. Blount, Jr., appeals from his conviction for aggravated sexual battery. K.S.A. 21-3518(1)(c). He contends there was insufficient evidence to support his conviction, that the State erred in charging him with aggravated sexual battery rather than rape, and that K.S.A. 21-3518(1)(c) is unconstitutionally vague and indefinite. We affirm.

1. Sufficiency of the evidence.

Blount contends there was insufficient evidence to support his conviction of aggravated sexual battery because the State failed to prove the victim's lack of consent. When a criminal defendant challenges the sufficiency of the evidence to support a conviction on appeal, the standard of review is whether the evidence,

viewed in the light most favorable to the prosecution, convinces the appellate court that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Dunn,* 243 Kan. 414, 429, 758 P.2d 718 (1988).

Sexual battery is the "unlawful, intentional touching of the *person of another who is not the spouse of the offender and who does not consent* thereto, with the intent to arouse or satisfy the sexual desires of the offender or another." (Emphasis added.) K.S.A. 21-3517. Aggravated sexual battery includes "sexual battery . . . committed in another's dwelling by one who entered into or remained in the dwelling without authority." K.S.A. 21-3518(1)(c).

In the present case, the evidence indicates Blount and the victim, E.M., had known each other for about three and one-half years prior to the incident. They had dated on and off during those years, had lived together on occasion, and were the parents of a daughter. During this relationship, Blount occasionally threatened to take their daughter and leave E.M., and, at one point, E.M. and the child moved into a battered women's shelter for a while because of those threats. Blount later apologized, and E.M. decided to resume living with Blount.

In May and again in June 1987, E.M. asked Blount to move out of her apartment where he had been staying since March. Each time Blount became angry and violent, although he finally left at the end of June.

On July 3, E.M. found Blount in her home. Blount indicated he wanted to stay overnight. When E.M. told Blount he could not stay, he said he was staying despite E.M.'s wishes. Blount became angry, and finally E.M. agreed to let Blount stay.

The next day, after Blount left for work, E.M. locked the house and then telephoned Blount, telling him not to come over anymore. Nevertheless, Blount went to E.M.'s house, broke in, and, after a verbal fight with E.M., hit her, breaking her nose. E.M. called the police. According to one of her friends, E.M.'s face was swollen and black and blue, and she had marks on her neck because of the fight.

Subsequently, at Blount's request, E.M. allowed Blount to come to her home and visit their daughter. E.M. refused the advances Blount made as he was leaving.

On August 1, 1987, Blount telephoned E.M. at 3:30 a.m. and told her he wanted "to come over and have sex with [her.]" E.M. told Blount he could not come over and he should leave her alone. E.M. testified Blount became hysterical, screamed, and yelled. E.M. stated the call "scared [her] to death." She admitted that during the call Blount told her he loved and cared for their daughter and E.M. and wanted them to get back together to work things out.

According to E.M., Blount awakened her at 3:30 a.m. the following morning by pounding on her front door. E.M. went downstairs and opened the door without first checking to see who was there. She tried to shut the door, but Blount pushed it open and came inside. Blount said he wanted to have sex with E.M. She repeatedly told Blount to leave. He refused. At one point he grabbed E.M.'s arms and shook her. She testified this act terrified her. Blount told her, "I am bigger than you and stronger than you and I can take it if I want it." Blount also reminded E.M. of the July 4 incident and implied he would hit her again if necessary. Blount said he would leave peacefully if E.M. would have sex with him first. E.M. testified that, after about 30 to 45 minutes of arguing, she decided to stop resisting because she was afraid of getting hurt. Blount permitted E.M. to go and get her diaphragm, which was in the bathroom. She then removed her own clothing, either while she was in the bathroom or after she returned to the living room. Blount told her he wanted to use her bedroom, but E.M. persuaded him to stay in the living room. After having intercourse with E.M., Blount left. E.M. testified the intercourse occurred because Blount forced her to submit.

E.M. testified that she was hysterical after Blount left, and she called several of her friends because she thought Blount's conduct might have constituted rape, but she was not certain since she had initially opened the door. A friend testified E.M. was upset on August 3 and said she had had sex with Blount because he had threatened her. Blount telephoned her later that day to "say hi" and "thank [her] for last night." E.M. told Blount she did not want to talk to him and hung up.

E.M. then telephoned the police. The police interviewed E.M., and she told them a story consistent with her testimony at

trial. According to the police, E.M. was crying, emotionally upset, and shaky. The police interviewed Blount, and he became verbally abusive about E.M. when he learned of the allegations.

In looking at the evidence in the light most favorable to the prosecution, the evidence indicates that E.M. did not consent to Blount's wrongful touching, but submitted to it out of fear. The fear was justified because of Blount's past conduct toward E.M. That she had some control over the situation as evidenced by her ability to obtain the diaphragm and her ability to persuade Blount to stay in the living room does not mean E.M. consented to Blount's conduct. The State did not have to prove E.M. was physically harmed or that she had no freedom of movement to prove she had not consented to Blount's wrongful touching. E.M. did not consent willingly to Blount's conduct nor indicate to him such acts were acceptable; rather, E.M. made a choice to act as directed to avoid being physically harmed. Prior to submitting, she repeatedly made her intentions clear by indicating she did not want to have sex with Blount. E.M.'s intent or desire did not change but, rather, was overcome by her fear of Blount, which was based on his past behavior.

2. The charge.

Blount contends the prosecution erred in charging him with aggravated sexual battery when the facts, if proved, would have established rape. Blount contends the prosecution improperly charged him with aggravated sexual battery because it would not have been able to prove E.M. was overcome by force or fear, an essential element of rape.

Rape is sexual intercourse with a person who does not consent to the intercourse, under any of certain circumstances. The State must prove that the victim was overcome by fear or force, was unconscious, was physically powerless, or was incapable of giving consent because of a mental infirmity. Rape is a class B felony. K.S.A. 21-3502. Aggravated sexual battery includes the intentional touching of the person of another who is not the spouse of the offender and who does not consent thereto, with the intent to arouse or satisfy the sexual desires of the offender or another, and is committed in another's dwelling by one who entered into the dwelling without authority. Aggravated sexual battery is a class D felony. K.S.A. 21-3517 and 21-3518. The

elements the State must prove to establish aggravated sexual battery are not the same as those necessary to prove rape. *State v. Galloway*, 238 Kan. 415, 418, 710 P.2d 1320 (1985).

The prosecuting attorney, as the representative of the State in criminal prosecutions, controls criminal prosecutions. He has the authority to dismiss any charge or to reduce any charge. *State v. Turner*, 223 Kan. 707, 709, 576 P.2d 644 (1978). The prosecuting attorney has broad discretion in discharging his duty. The scope of this discretion includes the power to determine what crimes shall be charged. Exercising this discretion involves evaluating the quality of the evidence prior to charging a person. *State v. Dedman*, 230 Kan. 793, 798, 640 P.2d 1266 (1982).

In the present case, the district attorney charged Blount with aggravated sexual battery. Clearly, the evidence supported the making of such charge. The evidence may have also supported a charge of rape, since it appears that E.M. was overcome by fear. However, after investigating the case and evaluating the evidence, the district attorney decided to charge only aggravated sexual battery. Determining whether a person shall be charged and what crimes shall be charged rests within the exclusive domain of the prosecution. *State v. Dedman*, 230 Kan. at 798. That the prosecution decided not to charge rape in the present case and instead decided to charge Blount with aggravated sexual battery does not constitute an abuse of discretion by the prosecution but, rather, was within the scope of its authority.

The prosecution did not act outside the scope of its discretionary authority in charging Blount with aggravated sexual battery.

3. K.S.A. 21-3518(1)(c).

Blount contends K.S.A. 21-3518(1)(c) is unconstitutionally vague because it does not define what constitutes lack of consent. He points out that other crimes, such as rape (K.S.A. 21-3502), define what constitutes lack of consent.

In determining whether a statute is unconstitutionally vague, a court should consider whether the statute gives fair warning to those potentially subject to it as to the conduct proscribed when measured by common understanding and practice. *State v. Robinson*, 239 Kan. 269, 273, 718 P.2d 1313 (1986). A statute which forbids "an act in terms so vague that persons of common intelligence must necessarily guess at its meaning and differ as to

its application" violates due process concepts. *State v. Dunn,* 233 Kan. 411, 418, 662 P.2d 1286 (1983).

The dictionary defines consent as including a "capable, deliberate, and voluntary agreement to or concurrence in some act or purpose implying physical and mental power and free action." Webster's Third New International Dictionary 482 (1971).

Contrary to Blount's contention, the statute in question is not unconstitutionally vague. A person of common intelligence could readily understand what constitutes a lack of consent and could determine when such consent has not been given. That the statute does not list every conceivable situation in which there might be a lack of consent does not render the statute unconstitutional, nor does the fact that other statutes have set out situations illustrating where there is a lack of consent. See, *e.g.,* K.S.A. 21-3502 (rape). A person of ordinary intelligence is on notice of the conduct prohibited by K.S.A. 21-3518 and does not have to guess at the meaning of "lack of consent" to determine whether one has acted in violation of the statute.

K.S.A. 21-3518 is not unconstitutionally vague.

Affirmed.